(Nos. 64302, 64318 cons

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant and Appellee, v. HENRY CARTER HILLEN-BRAND, Appellee and Appellant.

*Opinion filed March 23, 1988.*

RYAN, J., took no part.

Neil F. Hartigan, Attorney General, of Springfield, and Gary L. Peterlin, State's Attorney, of Ottawa (Roma Jones Stewart, Solicitor General, and David E. Bindi, Assistant Attorney General, of Chicago, and Kenneth R. Boyle, John X. Breslin and Gerry R. Arnold, of the State's Attorneys Appellate Prosecutor, of Ottawa, of counsel), for the People.

Robert Agostinelli, Deputy Defender, and Thomas A. Lilien, Assistant Defender, of the Office of the State Appellate Defender, of Ottawa, for Henry Hillenbrand.

JUSTICE WARD delivered the opinion of the court:

Eighteen years ago, the defendant, Henry Carter Hillenbrand, pleaded guilty to two counts of murder. Before he was sentenced, he escaped from the La Salle County jail and was a fugitive for 13 years until his capture and return to La Salle County in June 1983. He filed a mo-

tion to withdraw his guilty plea, which, after an evidentiary hearing, was denied. He elected to be sentenced under the law in effect at the time of the crimes. (Ill. Rev. Stat. 1969, ch. 38, par. 9—1(b)), and was sentenced to 50 to 150 years on the first murder charge and 80 to 240 years for the other murder, to be served consecutively. The appellate court affirmed the denial of the motion to withdraw the guilty plea but reversed the sentence and remanded for the imposition of concurrent sentences. (146 Ill. App. 3d 1075, 1083.) The defendant and the State petitioned for leave to appeal to this court; we allowed both petitions and consolidated them for review.

Hillenbrand was indicted in the circuit court of La Salle County for the June 29, 1970, murders of Patricia Pence and George Evans. He originally pleaded not guilty to the murder counts but withdrew that plea and entered a plea of guilty on October 19, 1970, and a judgment of guilty was entered. The factual basis, to which the defendant had stipulated, was read into the record at the time he pleaded guilty. The record shows the following. On June 29, 1970, the defendant parked his car several blocks from the residence of George Evans. Carrying a .22-caliber rifle wrapped in a blanket, he walked several blocks to Evans' house. He arrived about 7 a.m. and found Evans and Pence in bed together. Pence and the defendant had previously lived together and had a daughter, although they lived separately at the time of the murders. The defendant shot Evans in the head and then used the rifle as a bludgeon against Pence with such force that the stock of the rifle broke off. The defendant then took Pence to his car, and they went to the defendant's house. The defendant chased Pence outdoors and shot her; he then pursued the wounded woman through the backyards of several houses, and she

died on the back porch of a neighbor's residence. Several neighbors saw the shooting through their windows.

The defendant first contends that his attorney, Edward Rashid, at the time he entered the plea of guilty, labored under a *per se* conflict of interest as he had regularly represented Patricia Pence's parents in business and personal matters. He contends, relying on *People v. Stoval* (1968), 40 Ill. 2d 109, that, because Rashid operated under a *per se* conflict of interest, the defendant was presumptively prejudiced and his right to effective assistance of counsel was violated. As a result of this conflict of interest, the defendant contends, his conviction should be vacated and he should be allowed to withdraw his guilty plea.

The State says the *Stoval* rule is premised on the existence of a lawyer's contemporaneous professional commitment to another client. The State says no such relationship existed here because the Pences had not hired Rashid on a retainer basis, and he had concluded his work for the Pences prior to representing the defendant on these charges.

At the evidentiary hearing on the defendant's motion to withdraw his plea of guilty, Shirley Palochko, Rashid's secretary and bookkeeper for nine years, testified. Rashid had died in 1976. Palochko testified that Rashid had prepared personal and business income tax returns for June and Charles Pence, the parents of Patricia Pence. Mr. Pence, according to Palochko's testimony, was a "steady client" of Rashid between 1965 and 1970. She testified that Patricia Pence and the defendant operated a restaurant, and Rashid prepared their income tax returns for that business. The defendant had also come to Rashid's law office many times for legal services, including tax work. Rashid represented Mr. Pence in a marriage dissolution action against his wife, June, but had concluded his representation in the Pence divorce

prior to the murders. Rashid had also represented Mr. Pence on a gambling charge prior to the time of the shootings. Palochko testified that Rashid handled principally civil matters, although he did occasionally take criminal cases. The Pences did not have Rashid on retainer, and Palochko said she knew that Mr. Pence had been represented later by two other attorneys on his divorce and post-decree matters. Rashid did not receive substantial legal fees from either of the Pences or Patricia Pence. The defendant paid no legal fees for Rashid's volunteered representation on the murder charges.

The right to effective assistance of counsel is a fundamental right and entitles the person represented to the undivided loyalty of counsel. (*People v. Washington* (1984), 101 Ill. 2d 104, 109, *cert. denied* (1984), 469 U.S. 1022, 83 L. Ed. 2d 367, 105 S. Ct. 442; *People v. Coslet* (1977), 67 Ill. 2d 127, 134; *People v. Stoval* (1968), 40 Ill. 2d 109, 111.) This court held in *People v. Stoval* (1968), 40 Ill. 2d 109, 112, that allegations and proof of prejudice are unnecessary in cases when defense counsel, without the knowledgeable assent of the defendant, might not have an undivided loyalty to his client because of his commitments to others. (*People v. Coslet* (1977), 67 Ill. 2d 127, 133.) There was no showing in *Stoval* that the attorney had not properly conducted the defense of the accused, but this court determined that sound public policy required representation free from conflicts of interest. If a conflict of interest "in the form of conflicting professional commitments is shown, defendant need not demonstrate any prejudice to justify reversal." (*People v. Lewis* (1981), 88 Ill. 2d 429, 436, *cert. denied* (1983), 460 U.S. 1053, 75 L. Ed. 2d 932, 103 S. Ct. 1501; see also *People v. Fife* (1979), 76 Ill. 2d 418, 424.) The defendant, however, must show the attorney has a contemporaneous conflicting professional commitment to another. *People v.*

*Free* (1986), 112 Ill. 2d 154, 168-69, *cert. denied* (1986), 479 U.S. 871, 93 L. Ed. 2d 170, 107 S. Ct. 246; *People v. Washington* (1984), 101 Ill. 2d 104, 114; *People v. Coslet* (1977), 67 Ill. 2d 127, 133-34.

Leave to withdraw a plea of guilty is not granted as a matter of right, but as required to correct a manifest injustice under the facts involved. The standard under which this court will review the denial by a trial court of a motion to withdraw a guilty plea has been established. The general rule is that it is within the sound discretion of the trial court to decide whether a plea of guilty may be withdrawn under Rule 604(d) (107 Ill. 2d R. 604(d)), and that decision will not be disturbed unless it appears that the guilty plea was entered through a misapprehension of the facts or of the law, or that there is doubt of the guilt of the accused and the ends of justice would better be served by submitting the case to a trial. *People v. Hale* (1980), 82 Ill. 2d 172, 176.

Palochko's testimony established that Rashid regularly represented the Pences from 1965 to early 1970. He had also represented Patricia Pence on tax matters in connection with the restaurant, but that representation was concluded long before the murders. Rashid was not on retainer for the Pences, he had concluded all of his services prior to representing the defendant on these charges, he was not the only attorney the Pences consulted, and he derived little of his income from representation of the Pences. Under the circumstances, we conclude that Rashid did not have a contemporaneous professional commitment to the Pences that created a conflict of interest in his representation of the defendant.

The defendant also argues that, even though his attorney may not have been representing any of the Pence family members at the time of these murder charges, Rashid had a financial interest in seeking to maintain

the Pences' favor. In order that he would continue to receive business from the Pences, the defendant says Rashid had reason to stay in their good graces, creating a financial interest in retaining their favor. Too, because the Pences were possible prosecution witnesses on the murder charges, the defendant claims Rashid was in a conflict of interest situation. The State responds that this argument is contrary to *People v. Coslet* (1977), 67 Ill. 2d 127, 133, which stated that *Stoval* will not be followed when the only basis for doing so is the possibility of financial gain by the attorney.

This court has recognized that, in determining if a conflict of interest exists when defense counsel has represented a possible prosecution witness, one factor to be considered is whether the attorney's pecuniary interest and desire for possible future business might cause him to avoid vigorous cross-examination that might embarrass or offend the witness. (*People v. Cunningham* (1985), 107 Ill. 2d 143, 149-50.) As the State points out, the defendant's reliance on *People v. Robinson* (1979), 79 Ill. 2d 147, and *People v. Karas* (1980), 81 Ill. App. 3d 990, is misplaced. In *Robinson*, the court found that a professional relationship between the defendant's attorney and another client was ongoing and active in that *at the time of the defendant's trial*, the prosecution witness still owed legal fees to the defendant's attorney. (*Robinson*, 79 Ill. 2d at 161.) Similarly, the conflict in *Karas* was based on the attorney's representation of both the defendant and the victims of the murder charges, the co-owners of a restaurant, which was deemed to be an active relationship because the restaurant still owed legal fees to the lawyer's firm. (*Karas*, 81 Ill. App. 3d at 995.) There is no allegation here, nor any evidence, that the Pences still owed Rashid legal fees, which could make the professional relationship active and ongoing. The situation here also differs markedly from that in *People v.*

*Kester* (1977), 66 Ill. 2d 162, which the defendant relies upon, because the prosecutor there had personally prosecuted the defendant and later assumed the duties of court-appointed defense counsel for that defendant in the same criminal proceeding.

The alleged pecuniary interest of Rashid as the basis of a conflict is speculative at best, as Palochko testified Rashid did not derive significant income by representing the Pences. Moreover, "[t]he test is not and cannot be based only upon the source of a financial gain by the attorney. A rule based solely on financial gain would not only be unworkable in the everyday practice of law but would also have no necessary correlation with the conflicts of interest that arise in such practice. The *Stoval* rule, based upon *actual commitments* to others, is both workable and necessarily correlates with such conflicts." (Emphasis added.) (*People v. Coslet* (1977), 67 Ill. 2d 127, 133.) Rashid was not appointed to represent the defendant but voluntarily undertook the representation. It would be unreasonable to believe that Rashid would volunteer to represent Hillenbrand if he was concerned about currying the Pences' favor for future business. We would observe also that Rashid had previously represented Hillenbrand, which may have prompted his volunteering to represent the defendant on these charges. We judge that Rashid had neither an ongoing professional commitment to the Pences nor a financial interest in maintaining their favor that would have created a conflict of interest in representing the defendant. The trial court did not err in denying the defendant's motion to withdraw his guilty plea, based on this allegation.

The defendant also argues that his motion to withdraw his plea of guilty should have been granted as his counsel rendered ineffective assistance. The defendant claims that he did not knowingly and voluntarily enter the plea because his attorney failed to advise him of the

potential defense of intoxication. Without knowledge of the possible defense, the defendant says he could not make an informed choice to plead guilty. The defendant also argues that Rashid failed to adequately investigate that possible defense as he did not talk to the potential defense witnesses who had observed the defendant on the morning of the shootings. The trial court found (1) no evidence that Rashid did not effectively counsel the defendant, and (2) Hillenbrand's prime concern in pleading guilty was to reduce the possibility of receiving the death penalty.

This court has adopted the Supreme Court's two-pronged test concerning ineffective assistance of counsel set out in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052: (1) that counsel's representation fell below an objective standard of reasonableness, and (2) that his counsel's substandard representation so prejudiced the defense as to deny the defendant a fair trial. (*People v. Albanese* (1984), 104 Ill. 2d 504, *cert. denied* (1985), 471 U.S. 1044, 85 L. Ed. 2d 335, 105 S. Ct. 2061.) Effective assistance of counsel refers to competent, not perfect, representation. (*People v. Stewart* (1984), 104 Ill. 2d 463, 492, *cert. denied* (1985), 471 U.S. 1120, 86 L. Ed. 2d 267, 105 S. Ct. 2368.) "Mistakes in trial strategy or tactics or in judgment do not of themselves render the representation incompetent," and it is recognized that no two defense attorneys will necessarily agree on the same strategy for a particular case. (*People v. Hattery* (1985), 109 Ill. 2d 449, 461; see also *People v. Shum* (1987), 117 Ill. 2d 317, 370; *People v. Stewart* (1984), 104 Ill. 2d 463, 492.) The defendant must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. (*Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.) As we are considering whether the defendant was competently coun-

seled in his decision to plead guilty, our inquiry must focus on whether counsel's advice "was within the range of competence demanded of attorneys in criminal cases." *McMann v. Richardson* (1970), 397 U.S. 759, 770-71, 25 L. Ed. 2d 763, 773, 90 S. Ct. 1441, 1448-49.

At the hearing on the defendant's motion to withdraw his guilty plea, attorney Craig Armstrong, who handled estate and guardianship matters on behalf of Dawn Hillenbrand, the daughter of the defendant and Patricia Pence, testified for the defense. Armstrong testified he had filed a dramshop action in La Salle County on behalf of the administrator of the estate of Patricia Pence and sued three taverns that the defendant had allegedly visited the night before the murders. Armstrong testified that he had gotten the information that Hillenbrand had been drinking alcohol that night through conversations with Rashid and through reviewing Rashid's file on Hillenbrand's case. He had several conversations with Rashid about the dramshop action, and Rashid provided the names of the taverns that Hillenbrand had visited.

Raymond Boyles, Jr., a longtime friend of the defendant, testified that Hillenbrand was intoxicated the night before the murders. He testified that he had gone to a tavern about 6 p.m. the night before the murders. When Boyles arrived at the tavern, the defendant was already there, drinking at the bar. The defendant drank about a dozen beers during the time he was with Boyles. Boyles said he drove the defendant home between 12:30 and 1 a.m. because he had fallen asleep at the bar. Rashid had not interviewed him about these events. Edward Stroll testified he had also been at the tavern with Boyles and the defendant on the night before the murders. When Stroll arrived at the tavern about 12:30 a.m., Hillenbrand had his face down on the bar. He followed Boyles in Boyles' car when Boyles gave Hillenbrand a ride

home. Neither Rashid nor any investigators had questioned him about these events after the murders.

Gloria Hillenbrand, the defendant's younger sister, testified she saw the defendant on the morning of the murders at about 7:45 a.m. at her parents' home. She was 14 years old at the time. She said the defendant was drunk, "very glassy-eyed," smelled strongly of alcohol, was perspiring, and had blood stains on his shirt. He paced continuously during the 15 to 20 minutes he was there. Both of her parents were also home, and after her father called the police, the defendant ran out the back door. Russell Hillenbrand, the defendant's father, testified the defendant arrived at his home the morning of the murders in an incoherent state. He thought his son was drunk because he was glassy-eyed and smelled of beer. The defendant told Mr. Hillenbrand that he (the defendant) thought he had killed somebody, and Mr. Hillenbrand called the police. He testified his son had previously collapsed completely after drinking only two or three drinks at a Christmas party. He did not tell detectives investigating the murders that his son was intoxicated.

The defendant testified that he usually drank very little, but that he drank in excess during the two weeks prior to the murders. The defendant testified that before he went to the tavern that night, he already had drunk nearly a bottle of wine and a half-pint of whiskey. He recalled being in the tavern the night before the murders, but not leaving there. He recalled that he went to his parents' home the morning of the murders and that his father wanted to know what had happened. The defendant had only a "vague idea of anything that happened prior to going out to my Dad's house." After he ran from the backdoor of his parents' home, he noticed blood on his shirt and became worried about Patty because he was "kind of putting all the pieces together of what hap-

pened." He ran to the door of the nearest residence, pounded on the door, and asked to use the phone. He twice called St. Mary's Hospital to ask about Pence's condition, but the hospital would not provide information by phone. He asked the owner of the house to take him to the police station. En route to the police station, the two men were stopped by the police at an intersection.

The defendant said Rashid met with him in jail concerning the case about four times, for about 15 minutes each time. Hillenbrand testified that Rashid did not discuss his possible defenses and that, when he pleaded guilty, he neither knew his rights nor the difference between murder and manslaughter. He said repeatedly that he pleaded guilty because he was afraid he would get the death penalty if he had been tried. Before pleading guilty, Hillenbrand said that Rashid had "told me what was going on and the consequences about if I would have pled not guilty. And he showed me the weight of the evidence they had against me and everything. And he informed me that the prosecuting attorney was going to recommend the death sentence on me." Hillenbrand said he decided to enter a plea agreement to avoid the death penalty.

As the appellate court noted, the testimony at the hearing on the defendant's motion to withdraw his plea regarding Hillenbrand's alleged intoxication would have been contradicted by State evidence. When the trial court accepted Hillenbrand's guilty plea, it noted that Rashid had "gone through the state's file extensively" before the plea agreement. Rashid was thus aware of the State's evidence against Hillenbrand. That evidence, presented at the sentencing hearing, included the testimony of Betty Bennett, a close friend of Pence, who said that on June 29, 1970, she was having coffee at a local cafe when Hillenbrand came in at 3 a.m. He was angry that Bennett did not know Pence's whereabouts. She said she

did not detect anything unusual about his speech and she was of the opinion that he was sober. Dwane Lavell also testified that he saw Hillenbrand between 12 and 1 a.m. on the morning of the murders in front of a restaurant in Streator, and he did not notice that Hillenbrand was drunk. The bouncer at the tavern at the time of the murders testified that Pence and Evans came to the bar the night before the murders, talked to him for a moment, and went out the side door. He said Hillenbrand later came in, stayed only briefly, and that he was sober at the time.

Donald Haage, a Streator police detective who investigated the murders, said he went to Russell Hillenbrand's home about 7:40 a.m. in response to Mr. Hillenbrand's call to police. At 8:30 a.m., the police stopped a vehicle, in which Hillenbrand was a passenger, at an intersection road block and immediately placed him in handcuffs. After receiving his *Miranda* warnings, the defendant agreed to talk to Haage at the police station. He told Haage that he did not drive his car to Evans' house because he did not want Evans to hear or see him coming. After he had shot Evans, he took Pence out to the car and drove her to his apartment. He told Haage that after he shot Pence, he threw the rifle into weeds at the southwest corner of his apartment building. Haage testified that Hillenbrand was "certainly not intoxicated" at the time of the discussion. Nor had the defendant said or otherwise indicated that he was intoxicated. On cross-examination, Haage admitted he had not asked Hillenbrand if he had been drinking.

Thomas Bunn, who was a jailer for La Salle County at the time that Hillenbrand was charged with these murders, testified he talked to Hillenbrand at the jail about 9:30 p.m. on the day Hillenbrand was arrested. Bunn had made a memorandum of the conversation the morning after it occurred and testified based on the con-

tents of that document. According to Bunn's testimony, Hillenbrand told him he had been drinking, but was not drunk. Hillenbrand and Boyles had gone to the restaurant where Pence worked part-time about 3 a.m. and saw Betty Bennett there. Bennett had asked him where Pence was because she had not shown up for work. This information made Hillenbrand angry. He drove past Evans' house and saw Pence's car in front of the house. He peeked into a bedroom window and saw what he thought to be Pence's leg and foot protruding out from under the covers of the bed. He then drove to his apartment, got his rifle, and walked back to Evans' house, hoping someone would see him with the rifle. He told Bunn that he entered Evans' house through a broken window and went to the bedroom, where he found Evans and Pence in bed asleep. He shot Evans. He told Bunn that Pence became hysterical and refused to go to his apartment to talk, so he hit her with the rifle on the side of the head, breaking the handle off the rifle. While driving to his apartment with Pence, she jumped out of the car and he shot her. He shot her again when she tried to run around a nearby house. She got up from the ground, ran around the house and collapsed on the back porch. Hillenbrand told Bunn that he ran to the porch, saw a woman looking out a window, and ran away.

The record also reveals that Rashid appeared in court with the defendant five times on these charges. Rashid filed a motion on August 6, 1970, to disclose evidence favorable to the accused. He also filed a motion for physical inspection of evidence, specifically asking for any weapons, clothing and *empty liquor bottles* on the premises of the defendant's home prior to his arrest. That motion noted that not all the liquor bottles were on the premises of the defendant after his arrest. Rashid had also obtained a result from the laboratory manager of a Streator hospital, which showed Hillenbrand had been

tested for intoxication. In a letter dated July 20, 1970, Dr. Salama, the laboratory manager of the hospital, wrote to Rashid that "as far as I am concerned the amount of alcohol ingested by Henry is a toxic dosage which causes retardation of thought clouding consciousness and possibly a coma." The letter also noted, however, that the defendant's blood was drawn more than 48 hours after ingestion of alcohol and that no conclusions could be drawn from the blood samples; instead, the results were based on tests of his liver enzymes.

At the time the defendant pleaded guilty, the prosecutor read into the record a "Memorandum of Understanding and Agreement" between the defendant and the State, which was signed by the State's Attorney, the defendant, and the defendant's lawyer, Rashid. It was agreed that, if the defendant promised to plead guilty, the State would not seek the death penalty. Due process requires that a guilty plea not be accepted unless it appears to be knowing, intelligent and voluntary. (*People v. Williams* (1983), 97 Ill. 2d 252, 267-68, *cert. denied* (1984), 466 U.S. 981, 80 L. Ed. 2d 836, 104 S. Ct. 2364; see 107 Ill. 2d R. 402.) The record of the 1970 court proceedings of the defendant's entry of his guilty plea shows the defendant acknowledged that he knew his rights to a jury trial, to remain silent, to cross-examine witnesses, and to be proven guilty beyond a reasonable doubt. He responded affirmatively when asked if he was voluntarily entering his plea. The trial judge admonished repeatedly that, notwithstanding the agreement, he had the right to impose the death penalty, and the defendant repeatedly said he understood this. The defendant answered affirmatively that Rashid represented him, that he was the counsel of his choice, that they had discussed the matter fully, and that he was satisfied with his representation. The court found that the defendant was enter-

ing his plea voluntarily as he understood all his rights, the crimes of which he was charged, and the penalties.

Voluntary intoxication is not a defense to conduct that the law regards as criminal unless the intoxication makes impossible the existence of a mental state that is an element of the crime. Ill. Rev. Stat. 1969, ch. 38, par. 6—3(a); *People v. Wright* (1986), 111 Ill. 2d 18, 27; *People v. Walcher* (1969), 42 Ill. 2d 159, 163.

Upon reviewing the testimony and applying the *Strickland* standards, we are unable to say that counsel's assistance was inadequate. It is obvious from the pretrial motions concerning the empty liquor bottles, the laboratory test for intoxication, and the testimony of attorney Armstrong detailing his conversations with Rashid about Hillenbrand's drinking, that Rashid was considering intoxication as a defense. He apparently considered that inadvisable and decided in favor of a plea agreement. Nothing in the record, other than defendant's assertions, suggests that Rashid had failed to inform Hillenbrand of the intoxication defense. (See *People v. Kubat* (1986), 114 Ill. 2d 424, 433, *cert. denied* (1987), 481 U.S. 1007, 95 L. Ed. 2d 207, 107 S. Ct. 1634.) The records concerning the laboratory tests for intoxication show the defendant participated in the tests and suggest that the defendant was aware that Rashid was, at the early stages of this proceeding, examining a defense of intoxication. We cannot say that counsel's performance in deciding to forego intoxication as a defense fell below an objective standard of reasonableness, as he likely concluded, and we believe correctly, that intoxication would not have been a justified defense. See *People v. Mitchell* (1984), 105 Ill. 2d 1, *cert. denied* (1985), 470 U.S. 1089, 85 L. Ed. 2d 153, 105 S. Ct. 1857.

As the trial court observed, Hillenbrand's actions the night before and on the morning of the murders were not that of a drunken man. The evidence at the aggrava-

tion hearing, which we must assume Rashid had knowledge of because he had reviewed the State's Attorney's file, included the testimony of a number of witnesses who described Hillenbrand as sober when they saw him the night before the murders. Betty Bennett saw Hillenbrand in the early morning hours of the murders and believed he was sober. The bouncer at the tavern said he was sober. Dwane Lavell saw him at 1 a.m. and believed he was sober. Russell and Gloria Hillenbrand testified that the defendant was drunk, but they did not report this to investigators. In his account to detective Haage, the defendant recalled most of the details leading up to the murders and the actual crimes. He spoke to Haage shortly after the murders occurred, saying that he had parked his car so that Evans could not hear him approach, took his rifle, entered the Evans' residence through a broken window, shot Evans in the head, drove Pence to his own apartment, and then, while pursuing her outdoors, shot her several times. The defendant's comprehension and recollection of the events are also shown through his comments to his father that he may have killed someone, his retreat from his parents' home after his father contacted police, his phone calls to the hospital asking about Pence's condition, and his request to a neighbor to be driven to the police station. All of these actions indicate the defendant was acting knowingly. (*People v. Walcher* (1969), 42 Ill. 2d 159, 163.) We can only conclude that it appeared that the defense of intoxication would not have applied. (*People v. Weir* (1986), 111 Ill. 2d 334, 340; see also *People v. Greer* (1980), 79 Ill. 2d 103, 123.) Accordingly, the defendant was not prejudiced by trial counsel's failure to pursue the defense, and his argument that he was denied the effective assistance of counsel must fail.

The defendant also contends that the appellate court improperly focused on the prejudice component of the

two-pronged test for ineffective assistance of counsel adopted by this court in *Albanese*. The defendant contends the court should have focused on whether he made an informed decision to plead guilty rather than whether the defense would succeed at trial. The appellate court did not err. This court noted in *Albanese*: " '[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. *** If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.' " *Albanese*, 104 Ill. 2d at 527, quoting *Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069-70.

Having rejected both of the defendant's arguments concerning his motion to withdraw his plea of guilty, we affirm the appellate court's judgment that the trial court did not err in its denial of the motion.

The defendant next challenges his consecutive sentences of 50 to 150 years for the murder of Evans and 80 and 240 years for the murder of Pence. The defendant, although he pleaded guilty to the two murders on October 19, 1970, had escaped from the La Salle County jail and was a fugitive for 13 years. He was sentenced on these charges on February 24, 1984. Before sentencing, the defendant elected to be sentenced under the law in effect at the time of the offense, rather than the law in effect at the time of his sentencing. On appeal to the appellate court, though, the defendant asserted that a version of the Unified Code of Corrections, which was enacted and then superseded by an amendatory act during the pendency of his case, was more favorable to him, and he should receive the benefit of that sentencing law. The appellate court agreed with the defendant that section 8—2—4(a) (Ill. Rev. Stat. 1983, ch. 38, par. 1008—2—4(a)) applied and that he should have been sentenced

under the law most favorable to him during the pendency of his case. The appellate court remanded for amendment of the mittimus to reflect imposition of concurrent sentences, rather than consecutive.

Section 8—2—4 provides:

"(a) Prosecution for any violation of law occurring prior to January 1, 1973, is not affected or abated by the Unified Code of Corrections. If the offense being prosecuted has not reached the sentencing stage or a final adjudication by January 1, 1973, then for purposes of sentencing the sentences under the Unified Code of Corrections apply if they are less than under the prior law upon which the prosecution was commenced.

(b) Prosecution for any violation of law occurring before the effective date of this amendatory Act of 1977 is not affected or abated by this amendatory Act of 1977. If the defendant has not been sentenced before the effective date of this amendatory Act of 1977, he shall have the right to elect to be sentenced under the law as it existed at the time of his offense or under the law in effect on and after the effective date of this amendatory Act of 1977. If a sentence has been imposed before the effective date of this amendatory Act of 1977, the defendant shall not have the right of election even though his case has not been finally adjudicated on appeal ***." Ill. Rev. Stat. 1983, ch. 38, par. 1008—2—4.

The defendant contends that both section 8—2—4(a) and section 8—2—4(b) apply to him, as he had not been sentenced prior to the effective date of January 1, 1973, noted in section 8—2—4(a), nor had he been sentenced by the effective date of the amendatory Act of 1977, as noted in section 8—2—4(b). Because both sections could apply to his case, the defendant says an ambiguity exists and that that ambiguity should be decided in his favor. The version of the Code the defendant wants to apply was in effect only from January 1, 1973, to July 1, 1974. Section 5—8—4(c) thereof provided that the aggregate minimum period of consecutive sentences shall not ex-

ceed twice the lowest minimum term authorized for the most serious felony involved. (Ill. Rev. Stat., 1972 Supp., ch. 38, par. 1005—8—4(c).) Under the law, the lowest minimum term for murder was 14 years so that, under this enactment, the aggregate minimum period of *consecutive* sentences could not exceed 28 years.

The State, as petitioner in Docket No. 64302, contends the appellate court erred in ordering that the consecutive sentences imposed be served concurrently. The State says the version of the Code that the defendant cites does not apply because section 8—2—4(b) permits the defendant to elect to be sentenced only under the law in effect at the time of the offense (1970 here) or the law in effect at the time of sentencing (1984 here). The State also asserts that the defendant waived this issue because he did not raise it before the trial court and that he should be estopped from arguing that he is entitled to the benefit of the more lenient intervening statute, as he should not benefit from his escape and unlawful absence from this State for 13 years. Alternatively, the State argues that the portion of section 8—2—4(a) that says "sentences under the Unified Code of Corrections apply if they are less than under the prior law upon which the prosecution was commenced" refers to the current version of the Code, rather than the version as it was originally enacted in 1973. As such, the State argues that the amended Code applies and that section 8—2—4(b) allows the defendant to elect only between the current Code or the law under which the prosecution was commenced.

The State's construction is not supported by the clear language of the statute. The two subsections refer to different versions of the Code. Section 8—2—4(a) specifies the effective date of the original Code, January 1, 1973, while section 8—2—4(b) specifies the effective date of the 1977 amendatory Act. If the legislature intended that section 8—2—4(a) refer to the amended version of the

Code, it would have identified that version as the "amendatory Act of 1977," as it did in section 8—2—4(b). Section 8—2—4(a) was amended when section 8—2—4(b) was added to change references to "sentences under this act" (meaning the 1972 Act) to the "sentences under the Unified Code of Corrections." Thus, the change to the "Unified Code of Corrections," rather than the amendatory Act of 1977, indicates an intent that the sections are referring to different versions of the Code. Under the State's construction, the sentences under the amendatory Act of 1977 would apply under both sections, which would create an anomalous result, as there would be no need to have two separate sections.

We agree with the defendant that the appellate court properly applied the sentencing law most favorable to him. The odd circumstances of this case—that the defendant escaped before he was sentenced, was captured 13 years later, and was eventually sentenced 14 years after the offenses occurred—make both section 8—2—4(a) and 8—2—4(b) apply. He was neither sentenced before the January 1, 1973, date specified in section 8—2—4(a) nor before the effective date of the amendatory Act of 1977 specified in section 8—2—4(b). When the statute construed is ambiguous, it is " 'the function of the courts to ascertain and give effect to the intent of the legislature, arriving at such intention not only from the language employed in the legislation, but also from the reason and necessity for the law, the evils to be remedied, and the objects and purposes to be obtained.' " (*Fitzsimmons v. Norgle* (1984), 104 Ill. 2d 369, 373, quoting *Mid-South Chemical Corp. v. Carpentier* (1958), 14 Ill. 2d 514, 517.) As the defendant correctly contends, this court has repeatedly held that an ambiguity in a penal statute as to which of two possible penalties is to be imposed is to be resolved in favor of lenity. (*People v. Tarlton* (1982), 91 Ill. 2d 1, 5; *Fitzsimmons v. Norgle*

(1984), 104 Ill. 2d 369, 374.) Under the original section 8—2—4, a defendant convicted and sentenced prior to the effective date of the Code was entitled to be resentenced if his case was still on appeal after the Code became effective. (*People v. Chupich* (1973), 53 Ill. 2d 572; *People v. Harvey* (1973), 53 Ill. 2d 585; see also *People v. Williams* (1975), 60 Ill. 2d 1.) Section 8—2—4(b), which was added by the amendatory Act of 1977, distinguishes between those defendants yet to be sentenced and those who have already been sentenced before the cutoff date. The purpose of section 8—2—4(b), this court determined in *People v. Grant* (1978), 71 Ill. 2d 551, 561-62, is "to avoid numerous applications to the circuit court for resentencing." (See also *Johnson v. Franzen* (1979), 77 Ill. 2d 513, 519.) Though it is unlikely that the legislature contemplated the series of events that occurred here in enacting this section, the language of both subsections shows clearly that the legislature intended that, if the law has changed before a defendant has been sentenced, the defendant will receive the benefit of the lesser sentence. *People v. Williams* (1975), 60 Ill. 2d 1; *People v. Vines* (1976), 43 Ill. App. 3d 986.

We recognize that the unusual circumstances here create the ambiguity, as both subsections have been triggered by the defendant's improper and lengthy absence from this State. Consistent with the legislature's expressed intent that a defendant receive the benefit of the lesser sentence when the law is changed, however, we must reject the State's estoppel and waiver arguments. We judge that the defendant should be sentenced under the original Code, which was in effect from January 1, 1973, to July 1974. The minimum aggregate of the consecutive terms imposed by the trial court is 130 years, which violated the provision of section 5—8—4(c) (Ill. Rev. Stat., 1972 Supp., ch. 38, par. 1005—8—4(c)) permitting consecutive sentences not to exceed 28 years.

The appellate court correctly held that the consecutive sentences imposed by the trial court were improper.

The appellate court, noting that a minimum aggregate term of 28 years would be a "radical reduction" in the sentences imposed by the trial court, ordered that the terms run concurrently. The defendant asks that we either affirm the appellate court's decision, further reduce his sentence, or remand for a new sentencing hearing. The State asks that we either affirm the trial court's consecutive sentences or affirm the concurrent sentences ordered by the appellate court, but claims this cause should not be remanded for a new sentencing hearing. We consider that the testimony presented in aggravation and mitigation, along with the serious nature and circumstances of the crimes, supports the lengthy sentences imposed by the trial court.

Beyond the testimony that has been detailed here previously, the trial court heard the testimony of numerous aggravation and mitigation witnesses. One of the 19 aggravation witnesses, a Streator police investigator at the time of the murders, testified that a witness to the crimes told him that he saw Hillenbrand shoot Pence. Three neighbors of Hillenbrand testified they heard screams and commotion in their backyards about the time of the murders. Two of those neighbors looked outside their windows and recognized Pence and Hillenbrand, whom they both knew. They saw Hillenbrand shoot Pence with a rifle and saw Pence grab her midsection. She then got up from the ground and ran between one house and another house. They saw Hillenbrand shoot at Pence twice more. The other neighbor saw Pence, whom he did not know, run onto the back porch of another house. He saw the defendant come onto the back porch and hit her forcefully with a rifle's butt over the head three to six times and that splinters of wood were flying from the rifle.

John Patterson, a former brother-in-law of Hillenbrand who had been convicted in 1983 of a murder in Missouri, was also called by the State at the sentencing hearing. He testified that Hillenbrand had participated in a number of petty crimes, including the shooting of hunting dogs, burning another person's bushes, and shooting deer out of season. He also testified that the defendant had hit his sister, Hope, when they were married. He said, though, that the defendant had been in a religious sense "saved" and that he contributed most of his money to his church.

Other testimony at the sentencing hearing showed that Hillenbrand had been charged in March 1970 with burglary of a Ottawa home and that he had signed a statement admitting his participation in the crime. The defendant had also, along with two other inmates, escaped from the La Salle County jail on November 17, 1970. Another aggravation witness testified that, after the three men escaped from the county jail, her house was burglarized and that men's clothes, linens, a coin collection, guns, and about $200 in cash had been stolen. Michael Lyle testified that Hillenbrand and another man stopped his car at an intersection in the Streator area about 9:30 p.m. the day after the jail escape, forcing him to drive them to Chicago. While traveling to Chicago, Lyle testified he could see Hillenbrand in the backseat, through the rearview mirror, with a gun pointed at Lyle's head. He was terrified throughout the entire 2½-to 3-hour drive to Chicago. The other man wanted to kill Lyle when they arrived in Chicago, but Hillenbrand did not want to kill him. The defendant released Lyle unharmed at a fast-food restaurant in Chicago.

An FBI agent testified that Hillenbrand's arrest in Canada in November 1982 for possession of an unregistered firearm eventually led to his capture in May 1983 in Missouri. He was arrested in Canada under his as-

sumed named, Thomas Charles Elliott. He was finger-printed and released, but when he did not appear for a subsequent court appearance, Canadian authorities sent his fingerprints to the FBI, which matched the prints with those of Hillenbrand. The FBI tracked down Hillenbrand through the Missouri license plate number that appeared in the arrest record in Canada.

The defendant called 22 witnesses in mitigation. Many of the witnesses were from McDonald County, Missouri, where the defendant had lived for 13 years as a fugitive. Those witnesses knew the defendant as Thomas Elliott, the name he had assumed as a fugitive. The defendant's former wife from Missouri, Hope Elliott, testified that she first married the defendant in 1973, divorced him in May 1980, remarried him in July 1981, and then again divorced him in December 1982. A son was born during each of the marriages. She testified the defendant was very close to his sons. The defendant did not hit her or threaten her during their two marriages. She admitted on cross-examination that, in her first divorce proceedings, she had alleged that Hillenbrand had threatened her and had testified in those proceedings that he had struck her. She had also testified in the divorce proceedings that he made threats to do her bodily harm if he saw her with another man and that he would kill both of them.

Various witnesses from McDonald County, Missouri, testified that the defendant was a dependable worker, good husband, and attentive father. The defendant frequently repaired televisions and other appliances for friends at no charge. Other mitigation evidence shows that the defendant donated deer meat to a youth home in White City, Kansas, and he was involved in another organization for homeless children. The mitigation testimony also showed the defendant had become very involved in a local church in 1980 and was an avid Bible

student. Several ministers and church deacons testified to his good reputation, honesty, and charitable acts. Many witnesses emphasized his involvement in the church, including that he had, at his own expense, remodeled the church. Other testimony presented in mitigation showed that Hillenbrand was active in a second church and had built an access ramp to the church for the handicapped. He frequently cut firewood for elderly couples in the area, and had modernized, at his own expense, an elderly couple's house by building an indoor bathroom. Other witnesses testified that Hillenbrand poached deer, but that it was a widespread practice in the county where poverty was common and that he gave the deer meat to elderly persons and others who had large families.

Other mitigation witnesses who knew the defendant came from the Streator area. Former co-workers described him as law-abiding, honest, and a good worker. The defendant's parents testified that their son previously had never hurt anyone or been violent, and both of the defendant's sisters testified that he had been a good, loving brother.

Hillenbrand testified at the sentencing hearing and also addressed the court at length in his allocution. Although he expressed remorse for the killing of Pence and Evans, he had no remorse for the escape from prison, saying "I got thirteen years more of my freedom, which I never would have had because I don't know what kind of sentence I would have had back then."

The trial court, before imposing the lengthy consecutive sentences, acknowledged the voluminous mitigation evidence, but stated that the passage of time "cannot erase or excise the seriousness of the crimes committed by the defendant." The murders here, as made clear by the testimony of the defendant himself, the neighbors

who witnessed it through their windows, and the detectives who investigated it, were brutal and heinous acts. Sentencing judges are vested with a wide discretion in order to permit reasoned judgments as to the penalty appropriate to the particular circumstances of each case. (*People v. Younger* (1986), 112 Ill. 2d 422, 427.) Although the defendant offered much mitigation evidence to show he led a peaceable life in Missouri, we would agree with the trial court's observation that the defendant could not have afforded even a minor scrape with law enforcement officials, as he was a fugitive from two murder convictions in this State. The nature of the crimes was sufficient justification for the imposition of sentences far in excess of the allowable minimum of 14 years. (*People v. Williams* (1975), 60 Ill. 2d 1, 16.) The evidence supports the trial court's decision, and there was no abuse in imposing the lengthy sentences. We affirm the appellate court's affirmance of the sentences of 80 to 240 years for the murder of Pence and 50 to 150 years for the murder of Evans, and its order that the terms run concurrently.

For the reasons given, the judgment of the appellate court is affirmed, and the cause is remanded to the trial court with directions to enter an order that the sentences imposed are to run concurrently.

*Appellate court affirmed;*
*remanded with directions.*

JUSTICE RYAN took no part in the consideration or decision of this case.