(No. 36214.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOSEPH ODUM, Plaintiff in Error.

*Opinion filed February 1, 1963.—Rehearing denied March 27, 1963.*

GEOFFREY F. GROSSMAN, of Chicago, and BURTON V. DuBoe, of Morton Grove, appointed by the court, for plaintiff in error.

WILLIAM G. CLARK, Attorney General, of Springfield, and DANIEL P. WARD, State's Attorney, of Chicago, (FRED G. LEACH and E. MICHAEL O'BRIEN, Assistant Attorneys General, and EDWARD J. HLADIS and JAMES R. THOMPSON, Assistant State's Attorneys, of counsel,) for the People.

Mr. CHIEF JUSTICE SOLFISBURG delivered the opinion of the court:

Defendant, Joseph Odum, was found guilty of murder by

a jury in the criminal court of Cook County and sentenced to a term of 35 years in the penitentiary. He brings writ of error contending that testimony of police officers was erroneously admitted as to a dying declaration of the decedent, Walter Pennegar; that evidence of another crime was improperly admitted; and that he was not found guilty beyond a reasonable doubt.

Prior to the trial, the judge conducted a lengthy preliminary hearing on the question of whether a statement made by the decedent, Pennegar, to police officers could be admitted during the trial as a dying declaration. This statement purported to identify the defendant as one of three men who came to the door of Pennegar's home, representing themselves as police officers, and shot him three times. The crime occurred about 12:30 A.M. on May 4, 1956. Pennegar died at 5:00 A.M. on that day in the operating room of Provident Hospital in the city of Chicago.

The trial judge ruled that he was convinced beyond a reasonable doubt that the statement made by the deceased was made in contemplation of death, and that it could be admitted during the trial as an exception to the hearsay rule. Evidence of the statement was accordingly permitted to go to the jury. The fundamental question involved in this appeal is whether the trial court properly admitted the statement as a dying declaration.

Although we are reluctant to disturb the ruling of the trial judge on the admissibility of a purported dying declaration (Wigmore on Evidence, sec. 1442, p. 238, 3rd ed., 1940), we cannot refuse to inquire into the circumstances surrounding the statement in this case. We therefore look to the record.

Officers Anglin and Lindsay testified that they received a call to 375 West 55th Place in Chicago about 12:30 A.M. They found Pennegar bleeding from three bullet wounds. They put him on a stretcher and took him to Provident Hospital. Anglin testified: "He (Pennegar) said Glenn

and Jules Taylor and another fellow (shot him). My partner asked him was he positive those w[h]ere the men because he would probably be dying, he was in pretty bad shape." Lindsay testified: "When we entered the room I asked him what happened and he told me that three men had come in and shot him. I asked him did he know any of the persons that had shot him, and he mentioned the name Glenn. And seeing his condition, we immediately went out and got a stretcher. On the way to the hospital, we told him that it was pretty serious, the place where he was shot and we tried to question him in the car, but going through traffic we couldn't do that very well. That was my reason for attempting to question him, because of his condition."

Officer Genda testified that at the hospital: "I asked him who shot you, and he said Glenn shot me, and that Jules Otis was with him." Genda claimed to be the first officer at the hospital, and that no oxygen was being administered to Pennegar at the time. Genda was in the hospital five or ten minutes.

Sergeant Traut testified that the nurse removed the oxygen mask, and he talked to Pennegar: "I said you are hit bad, real bad, can you tell us what happened. And at that time he told me that he was shot by a Glenn and a Jules or Joseph and I couldn't get the last name, whether it was Otis or Odum or what, and I kept on: 'Can you spell the last name for us?' and he was in very serious condition and he said, 'I was to testify against him in a narcotics case'. At that time the nurse and doctor requested that I move away so they could treat the man. They again administered some oxygen to the man."

Sergeant Walsh testified that he talked to Pennegar, that he was on one side of Pennegar's head and Traut was on the other. He testified: "I asked him who shot him. He said a man by the name of Glenn and a man known as Jules."

Officer Parker testified that there were about 15 police-

men at the hospital when he arrived. He did not have a conversation with Pennegar, but he was present when officer Younger did. Parker testified that in response to a question by Younger: "he (Pennegar) said Jules Taylor and then he said Glenn. He said something else and apparently I didn't understand it." Parker did not hear any conversation between Pennegar and anybody other than Younger.

Officer Younger arrived at the hospital with officer Parker. When he arrived there were six or eight other police officers present. He waited until Sergeant Traut had finished his conversation and moved back away from Pennegar, and then he moved beside Pennegar and had a conversation. Younger testified: "I told him I was a police officer assigned to the 5th District. I said, 'What happened to you?' He said, 'It looks like they've got me.'" Younger also testified, in response to a question on what else Pennegar said: "And he said 'Glen'. Then he said some other things that I couldn't hear. And I moved in closer to his mouth and I heard him say 'I'm going' after which the nurse, Miss Bailey, asked me if I would mind stepping back. Before I stepped back, however, he told me, he said, 'I'm going to appear against one of them in a narcotics case.'"

The discrepancies already apparent in the statement relayed by the seven police officers indicate the need for the safeguards which the law has placed about dying declarations. No two witnesses of the extraordinarily large number of men who interrogated the victim told the same story.

The nurse in the emergency room was called to testify, and the following testimony was elicited:

"Mr. Gordon—Assistant State's Attorney:

Q. What did he (Pennegar) ask you?

A. He asked 'Nurse, do you think I am in pretty bad shape?'

Q. What did you say?

A. Well, I told him that right now I wouldn't say that because I have seen worse cases. Right now, I wanted him to keep quiet and try to fight for his life.

Mr. Johnstone—Defense Counsel:

Q. Have you finished your answer?

A. I said—he asked me this question, 'Do you think I am in pretty bad shape?' I told him that I had seen worse and right now I want him to keep quiet, and I was probably about to apply the mask over his face, so I couldn't hear him if he had it over his face. I wanted him to keep quiet at the time and we will try to pull him through. Some reassuring answer like that. That is what I told him."

The nurse also testified that she did not hear any conversation between Pennegar and the officers. She took the oxygen mask off once. She did not hear any officer say "You got it pretty bad" or words to that effect.

The doctor, the resident who was in charge of the emergency room, had no independent recollection of the case. On direct examination he said nothing concerning the condition of the patient. He had no recollection of examining the victim, nor did he remember any of the events of the morning of May 4, 1956. The medical report the doctor prepared at the time was admitted in evidence. It disclosed that the victim was grievously wounded.

The law with respect to dying declarations has been firmly established in this State. They are defined as statements of fact by the victim, concerning the cause and circumstances of a homicide. To make them admissible into evidence as dying declarations, an exception to the rule against hearsay evidence, it must appear that they are made by the victim under the fixed belief and moral conviction that death is impending and certain to follow almost immediately, without opportunity for repentance and in the absence of all hope of avoidance, when he has

despaired of life and looks to death as inevitable and at hand. *People* v. *Tilley,* 406 Ill. 398, 403; *People* v. *Hubbs,* 401 Ill. 613; *People* v. *Savant,* 301 Ill. 225.

The reasons for this stringent rule were stated in *Starkey* v. *People,* 17 Ill. 16, 20, "The statements of the deceased as to the cause of the injury from which death finally results, when dying declarations within the meaning of the law, are admitted in evidence on the ground of necessity, and the rule under which they are admitted, forms an exception in the law of evidence. The accused, under the rule has not the benefit of 'meeting the witness against him face to face;' a constitutional right in all criminal trials with this solitary exception. He is deprived of the security of an oath attended with consequences of temporal punishment for perjury. He is deprived of the great safeguard against misrepresentation and misapprehension— the power of cross-examination. The evidence is hearsay in its character; the statements are liable to be misunderstood and to be misrepeated upon the trial, and the evidence goes to the jury with surroundings tending to produce upon the mind emotions of deep sympathy for the deceased, and of involuntary resentment against the accused."

The People acknowledge that the foregoing cases state the present Illinois rule concerning the necessary foundation for the admission of evidence of a dying declaration. However, they urge us to re-examine the law, and, in their words, "to place this court with those of sister jurisdictions who have freed the doctrine of dying declarations from the rigid and often illogical rules first fixed from the time it came into existence at common law."

In this case the testimony shows that none of the medical personnel advised the victim that he faced imminent death. What the victim himself said cannot be construed as indicating that he had abandoned hope. While the police officers frequently stated that the victim was dying, it

is the state of mind of the deceased and not that of any other person which determines admissibility. (*People* v. *Tilley,* 406 Ill. 398, 403.) As this court held in *People* v. *Maria,* 359 Ill. 231 and *Brom* v. *People,* 216 Ill. 148, the belief of the dying man and not the belief of those around him furnishes the guaranty of truthfulness that makes his dying declaration admissible in evidence.

From the entire record we find an insufficient basis for the introduction of evidence of decedent's statements.

The defendant also contends that it was improper to permit the clerk to read an indictment of the defendant on a narcotics charge, whereon the name of the victim, Pennegar, was endorsed as a witness. The indictment, charging unlawful sale of narcotics, was filed on April 4, 1956, approximately a month before Pennegar was killed. The State contends that the reading of the indictment in evidence was justifiable on the theory that this evidence tends to establish a motive for the crime, although such evidence also shows another crime, *People* v. *Harvey,* 12 Ill.2d 88.

The defendant concedes that evidence of other crimes is admissible insofar as it tends to prove identity, absence of a mistake or accident, motive or intent, or a common scheme or design. (*People* v. *Battle,* 24 Ill.2d 592; *People* v. *Prohaska,* 8 Ill.2d 579.) However, he insists that it would have been sufficient for the People to introduce evidence that defendant had been charged with a crime and the deceased was the informer, without disclosing the facts or nature of the crime. He further suggests that the People could have called Captain Healy to testify that defendant knew Pennegar was to testify at his trial.

We think this objection is without merit. In *Commonwealth* v. *Flori,* 300 Pa. 125, 150 Atl. 290, the defendant Flori shot and killed one Livoy. During the trial indictments of Flori for the robbery of Livoy were admitted in evidence. On appeal the Supreme Court of Pennsylvania held that the indictments were not offered as proof of separate

offenses, but for the purpose of showing the motive and reason for the killing, and for such purpose they were clearly admissible.

In the case at bar the indictment bearing the name of the deceased as a witness was not evidence of a separate offense, but it did tend to prove that defendant was informed that the deceased was a witness who would appear against him and thus tends to prove a motive. We think the introduction of the indictment itself was a more appropriate method of supplying such proof than the introduction of the testimony of an investigating officer. We also note that defendant does not complain that the trial court failed to properly limit the purpose for which the evidence was offered. We hold that the indictment tends to. prove motive, and hence no error was committed in permitting the clerk to read the indictment to the jury.

In view of our decision on the principal contention of the defendant, it is not necessary to consider the third contention, that he was not proved guilty beyond a reasonable doubt. The judgment of the criminal court of Cook County is reversed and the cause is remanded for a new trial.

*Reversed and remanded.*