THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. OSCAR PETERSON, Defendant-Appellant.

First District (2nd Division)   No. 1—87—0738

Opinion filed April 25, 1989.—Rehearing denied May 23, 1989.

Michael J. Pelletier and Anna Ahronheim, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Inge Fryklund, James Fitzgerald, and Christine Perille, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE BILANDIC delivered the opinion of the court:

Defendant Oscar Peterson was convicted by a jury of murder, robbery and the aggravated kidnapping of Gerald Broyles (hereinafter victim or deceased). On defendant's motion, the trial court vacated the aggravated kidnapping conviction and sentenced defendant to concurrent terms of 30 years for murder and seven years for robbery. Defendant appeals, arguing that he was denied effective assistance of counsel at trial; that he was denied a fair trial by the admission of a hearsay statement of the deceased to a paramedic; and that his 30-year sentence for murder is excessive. We affirm.

The alleged crimes occurred on September 24, 1984, in the vicinity of 69th and State Streets in Chicago, Illinois. Guys and Gals Lounge occupies the first floor of the building known as 6901 South State Street. Charlene Smith lives in a third-floor apartment in the same building. As she looked out of her apartment window at approximately 4 a.m. on September 24, 1984, she noticed two police officers talking to an elderly man and a young man. She identified the defendant as the younger man and the victim as the older man. Charles Fitzpatrick and Robert Poole were the officers engaged in the conversation with the defendant and the victim. She did not hear the conversation.

Ms. Smith saw the defendant and the victim walk east on 69th Street. There was no struggle or exchange of angry words. Then the officers entered the lounge on the first floor of her building and were out of her view. Next, she saw the defendant look back toward State Street, grab the victim by the collar, and drag him into a 3½-foot-wide gangway on the State Street side of her building. The only entrance or exit to the gangway was on State Street.

As defendant dragged the victim into the gangway, Ms. Smith saw the victim's foot clinging to an edge of the building. Then she noticed the foot quiver, go limp, and disappear from her view. Approximately two minutes later, she saw the defendant emerge from the gangway alone. Ms. Smith called 911 and reported the incident.

When she returned to her apartment window, she saw Officers Fitzpatrick and Poole leave the lounge and head for their squadrol and leave. Shortly thereafter, she noticed that the squadrol returned. She then saw the officers speaking to the defendant. She did not hear this conversation.

The officers testified that when they first observed the defendant and the victim at 69th and State Streets, the victim was bleeding from a laceration across his nose, his glasses were crooked, and he

smelled of alcohol. He told the officers that the defendant did not cause his injuries. Then the officers entered the Guys and Gals Lounge and talked to the night watchman for 5 or 10 minutes.

As the officers left the lounge in response to a call to check out the alley between 69th and 70th Streets, they noticed the defendant four or five feet from the gangway. They asked him about the victim, and defendant responded that he left in a car with some whores. Defendant was sweating profusely despite the fact that it was a fall morning. Because of his suspicious activity, the officers filled out a contact card regarding the defendant and then asked him to leave.

After completing the alley check, the officers returned to the corner of 69th and State Streets. The night watchman knocked on the window of the lounge to get their attention. They then noticed the gangway for the first time. With the help of a flashlight, they entered the gangway and discovered the victim in the fetal position, lying in a pool of blood, with his wallet and some papers nearby. They did not see any money. When the victim failed to respond to their questions, they called for paramedics.

Chicago fire department paramedics attended to the victim and took him to St. Bernard's Hospital. One of the paramedics, William Mallary, testified regarding the victim's condition and the treatment provided from the scene to the hospital. In addition, he testified that Broyles told him that he was the victim of a robbery and that the same person beat him up and robbed him. Mallary also testified that the victim appeared confused.

On October 2, 1984, the victim died at St. Bernard's Hospital. Dr. Kirschner, the forensic pathologist who performed the autopsy, testified that the immediate cause of death was "multiple blunt trauma injuries to the head" which caused the brain to bleed. No single blow could be identified as the cause of death, and the injuries could not have been caused by an accidental fall.

Because of the lead provided by the contact card, defendant was arrested on October 2, 1984. Between 10:20 a.m. and 10:55 p.m., defendant made four different oral statements. At 10:55 p.m., he made a written statement in which he said that on September 24, 1984, at about 4 a.m., on the corner of 69th and State Streets, the decedent told him that some "dudes" beat him up and tried to rob him of the $72 in his wallet. Then they encountered Officers Fitzpatrick and Poole. After the officers left, he "grabbed [the decedent] by the collar and forced him into the gangway." While the deceased struggled to get away, he struck his head against the building and fell. Defendant took the money from the deceased and left the gangway.

In response to their question, he told the police that the deceased had left in a taxi with some whores.

Defendant testified on his own behalf. He stated that he had lied to the police during the first four interrogations, but told the truth during the fifth because he was tired of covering up. Defendant's version of what happened is similar to his written statement, except that defendant met the deceased on a bus going south on State Street and that the deceased became hostile and struck him when he suggested that the deceased seek medical attention. As the deceased tried to strike him again, defendant grabbed the deceased's arm to stop him. They then fell into the gangway and wrestled. Defendant denied grabbing the deceased's collar or dragging him into the gangway. While they wrestled, the deceased struck his head against a wall. Defendant asked the deceased if he was all right, and there was no response. At this point, and not before, defendant decided to take the money. He did not seek medical help for the deceased. He was ashamed of himself for taking the money and not calling for medical help for the decedent.

During deliberation, the jury sent out two questions relating to robbery and involuntary manslaughter, which the judge answered. The jury returned verdicts of murder, robbery and aggravated kidnapping. The court later vacated the aggravated kidnapping verdict and denied defendant's motion for a new trial.

A death penalty hearing was held without a jury due to defendant's pretrial waiver. The trial court refused to impose the death sentence based either on the facts or defendant's background. The court also refused to sentence defendant to an extended term, even though he was eligible. Defendant was sentenced to 30 years for murder and a consecutive seven-year sentence for robbery.

Defendant then filed a *pro se* motion for a new trial based on ineffective assistance of counsel. That motion was denied and this appeal followed.

## I

Defendant initially contends that his appointed counsel's strategy deprived him of effective assistance of counsel. During opening, counsel indicated that the defense theory would be self-defense which caused an accident. Defendant's testimony was consistent, in that he stated that when the deceased and he were wrestling, they fell and the deceased hit his head. However, during the jury instruction conference, counsel stated that self-defense was no longer the theory, but that defendant was guilty of involuntary manslaughter and theft from

the person. Counsel also asked for instructions on these lesser offenses, but failed to tender any instructions on affirmative defenses or any other lesser offenses. Finally, in closing argument, defense counsel argued that if anything, the defendant was stupid and should be convicted of involuntary manslaughter and not murder.

██ In order to prove ineffective assistance of counsel, defendant must prove both prongs of the test set forth in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052. (*People v. Albanese* (1984), 104 Ill. 2d 504, 526 N.E.2d 1246, *cert. denied* (1985), 471 U.S. 1044, 85 L. Ed. 2d 335, 105 S. Ct. 2061.) The requirements are that the errors must be so great that counsel is not acting as "counsel" as guaranteed by the Sixth Amendment and, second, that the errors were so great as to deprive defendant of a fair trial. (*Strickland v. Washington*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.) This is a difficult evaluation due to the distorting effects of hindsight. This court should indulge a strong presumption that counsel's conduct falls within the wide range of professional assistance. Defendant must overcome the presumption that under the circumstances, the challenged action "might be considered sound trial strategy." 466 U.S. at 689-90, 80 L. Ed. 2d at 695, 104 S. Ct. at 2065-66.

██ Counsel's incompetence is to be determined from a consideration of the totality of counsel's conduct, not isolated incidents, and a reviewing court will not extend its inquiry into areas involving the exercise of judgment, discretion, trial tactics or strategy. *People v. Thurman* (1988), 169 Ill. App. 3d 996, 1005, 523 N.E.2d 1184.

██ Counsel's concession of guilt on a lesser offense does not, by itself, affect a conviction of a more serious offense. (*People v. Bone* (1987), 154 Ill. App. 3d 412, 415, 506 N.E.2d 1033, *appeal denied* (1987), 116 Ill. 2d 563.) A decision to rely on one defense theory to the exclusion of others is a matter of trial tactics. *People v. Gallardo* (1983), 112 Ill. App. 3d 764, 770, 445 N.E.2d 1213, *appeal denied* (1983), 94 Ill. 2d 554.

██ We find that counsel's performance was competent—he submitted and argued motions; investigated the case; effectively cross-examined witnesses; objected knowledgeably; and presented evidence on defendant's behalf. Counsel was well prepared, knowledgeable, and a strategic advocate for his client. The decision to promote a verdict of guilty of involuntary manslaughter rather than murder was, based on the evidence presented, sound trial strategy.

Defendant has not shown that counsel's actions constituted such serious errors that he was not functioning as defendant's attorney as

guaranteed by the sixth amendment. Nor has defendant shown that he was prejudiced by these "errors." There has been no showing that there was a reasonable probability that the result of the trial would have been different but for counsel's "errors."

Defendant did not suffer any prejudice from counsel's closing argument since the jury did not follow his suggestion of guilt on the charge of involuntary manslaughter. Enough evidence was presented to the jury to allow them to conclude that defendant performed the acts which caused the victim's death. In fact, defendant approved of counsel's strategy. Defendant was questioned by the court after closing arguments, outside the presence of the jury. He said that he was satisfied with counsel's representation and closing and that the closing was consistent with his testimony. In addition, counsel's decision not to tender the jury instructions was sound given the circumstances of this case. The instructions given represented the strongest theory of defense.

Therefore, viewed in totality, counsel was effective under the *Strickland* standard.

## II

The State sought to admit testimony from James Mallary, the paramedic who transported the deceased to the hospital, that the deceased told him that the same person who beat him had also robbed him. This testimony was allowed in, over defendant's motion *in limine*, apparently on the grounds that it fell within the hearsay exception for treating physicians. Defendant appeals, arguing the statement does not fall within any of the hearsay exceptions.

■ However, while defendant objected at a pretrial proceeding, he failed to include this error in his post-trial motion. Defendant's post-trial motion was five pages long and alleged 13 separate errors. This issue was not presented in the post-trial motion and, therefore, he has waived this alleged error on appeal. *People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124, *cert. denied* (1988), ___ U.S. ___, 102 L. Ed. 2d 263, 109 S. Ct. 274.

## III

Defendant was sentenced to a 30-year term for murder and a seven-year concurrent term for robbery. Defendant appeals the sentence for murder, claiming it is excessive in light of the strong evidence of defendant's potential to make a positive contribution to society and his lack of any significant criminal history.

■ Absent abuse of discretion, a sentence cannot be altered on

review. (*People v. La Pointe* (1981), 88 Ill. 2d 482, 492, 431 N.E.2d 344; *People v. Perruquet* (1977), 68 Ill. 2d 149, 153, 368 N.E.2d 882.) This court may not substitute its judgment for the trial court's merely because it "would have balanced the appropriate factors differently." (*People v. Cox* (1980), 82 Ill. 2d 268, 280, 412 N.E.2d 541.) This is especially true where the sentence imposed by the trial court is within statutory limitations. *People v. Lambrechts* (1977), 69 Ill. 2d 544, 559, 372 N.E.2d 641.

The 30-year sentence is not excessive based on the facts of this case. A 179-pound, 29-year-old man beats and robs a 129-pound, 67-year-old man, leaving him to die. The defendant was eligible for both the death sentence and an extended-term sentence for this crime. His sentence is well within the statutory limits.

The court conscientiously considered the evidence in aggravation and mitigation. Therefore, given the substantial nature of the evidence against defendant, this sentence will not be disturbed.

Accordingly, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

SCARIANO and EGAN,* JJ., concur.

---

*Justice Egan participated in the decision of this case prior to his assignment to the sixth division.