THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. THOMAS COBB, Defendant-Appellant.

Second District   No. 2—87—1194

Opinion filed August 1, 1989.

900

G. Joseph Weller and Thomas A. Lilien, both of State Appellate Defender's Office, of Elgin, for appellant.

Fred L. Foreman, State's Attorney, of Waukegan (William L. Browers and Cynthia N. Schneider, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE McLAREN delivered the opinion of the court:

Defendant, Thomas Cobb, was charged by indictment with one count each of murder (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)(1)) and armed violence (Ill. Rev. Stat. 1985, ch. 38, par. 33A—2). After a jury trial, the prosecution nol-prossed the armed violence count, and the jury returned a verdict of guilty on the murder charge. Cobb was sentenced to a 32-year term of imprisonment. Cobb appeals both his conviction and his sentence. We affirm.

On November 3, 1986, Cobb was at the home of the victim, Betty Rogers. Betty lived with her mother, Ethel Rogers, her two sisters, Ann and Dorothy Rogers, and her niece, Shawn Johnson. Cobb and Betty had been dating and planned to watch a football game on television that evening. Cobb watched the game in the living room with Ann, Dorothy and their brother Earl. Betty and Ethel remained in the kitchen. Betty was drinking beer throughout the evening.

Cobb and Betty argued during the first half of the game. At halftime, Cobb left the Rogers home and went to his sister's house, where he resided, a short distance away. Cobb returned with some of Betty's belongings that she had left there. On occasion, Betty would stay with Cobb at his sister's home. Cobb and Betty continued arguing throughout the second half of the game.

Sometime after the game, a struggle ensued in the kitchen and Betty was stabbed four times. The police were called and, upon arrival, found Betty lying on the kitchen floor in a pool of blood. Paramedics were summoned and they took Betty to the hospital. She was pronounced dead shortly thereafter.

The police located Cobb at Victory Memorial Hospital in Waukegan, Illinois. Cobb had gone there to get medical treatment for a laceration and puncture wound to his left temple. Cobb was arrested at the hospital at 2:45 a.m. He was given *Miranda* warnings and interviewed on two separate occasions.

On November 12, 1986, the Lake County grand jury indicted Cobb

for one count each of murder and armed violence. The trial in this matter began on May 11, 1987. The trial court ruled on several motions *in limine*. The court denied defendant's motions to exclude evidence that he carried a knife prior to November 4, 1986, and that he had talked of killing the decedent prior to that date. The court also denied defendant's motion to exclude evidence of a statement made by the victim after she had been stabbed. The trial court granted the State's motion to prevent defendant from presenting evidence of an incident that occurred approximately 16 years ago and for which the victim had been charged with and acquitted of murder.

At trial, Ann Rogers testified that Cobb and Betty got along sometimes and other times they did not. Two to three weeks prior to the stabbing, Ann had seen a knife in Cobb's waistband. She testified that on the night in question, she had watched a football game on television and then went to sleep on the living room couch. She was awakened by the sound of Betty's and Dorothy's voices in the kitchen. Ann got up and walked into the kitchen. As she arrived at the kitchen doorway, she saw Cobb hitting Betty with his fists. Cobb struck Betty 10 to 12 times in the head and upper body. Ann told Cobb to stop, but he did not respond. Betty fell to the floor, got up, and grabbed a bottle. She raised the bottle over her head and began to swing it at Cobb. Ann told Betty not to swing the bottle. Ann walked out of the kitchen and did not see if Betty hit Cobb with the bottle. Ann went into the living room to call for her mother. When she returned to the kitchen a couple of minutes later, she found Betty lying on the floor bleeding. There was no one else in the kitchen. She ran out the back door to go to a neighbor's home to phone the police. She saw Cobb standing by his car. She did not see a knife in Cobb's possession, nor did she see Cobb stab Betty. Ann went to Judy Williams' house to get help, and Judy called the police.

Dorothy Rogers also testified that she had seen Cobb with a knife two to three weeks prior to November 3. Cobb came over to the Rogers home, lifted his shirt to display the knife and said, "Where is Miss Mace at because I got a Mr. Mace." This was in response to a prior incident in which Betty had sprayed Cobb with mace. Dorothy also testified that Betty and Cobb had been arguing throughout the football game on November 3 and that Betty had been drinking all evening. After the game, Dorothy went to the store with her brother Earl and then dropped Earl off at Cobb's sister's house. Dorothy returned home and found Betty still in the kitchen drinking beer. Dorothy went to the stove to make a sandwich. She used a steak knife to cut the meat. While Dorothy was standing at the stove, Cobb

left the kitchen to go to the bathroom. Betty then approached Dorothy and ordered her to go to bed. Instead of arguing, Dorothy decided to skip the sandwich and go to bed. As she was leaving the kitchen, she glanced over her shoulder and saw Cobb returning to the kitchen. Dorothy also saw Ann approaching the kitchen from the living room. Dorothy saw Cobb strike Betty with his fists two or three times. She did not intervene because she thought it was none of her business. Dorothy did not see Betty pick up a bottle, but did see the bottle in the air. Dorothy continued into the living room and then returned to the kitchen. She saw Betty lying on the floor and Cobb walking through the hallway and out the back door. Dorothy saw a knife in Cobb's hand but could not see the handle. Dorothy called for Ann, and the two left the house to get help. Dorothy saw Cobb standing by his car. She went with Ann to Judy Williams' home, and Judy phoned the police. Dorothy went to Cobb's sister's house before going back to the Rogers home. Dorothy denied that she argued with or struck Betty. She also denied swinging the steak knife or stabbing Betty.

Shawn Johnson also testified that she saw Cobb carrying a knife with a black handle on two separate occasions approximately two to three weeks prior to November 3. She testified that on November 3, she went to the Zion Leisure Center and returned home at approximately 9:30 p.m. She did her homework in her bedroom and went to sleep at approximately 10:30. She was awakened by her Aunt Ann and Aunt Dorothy, who were screaming. Shawn got out of bed and went into the kitchen. She saw her grandmother, Ethel, wiping blood from the floor. She also saw her Aunt Betty lying on the floor bleeding. Ann and Dorothy were not in the kitchen at this time. Shawn was standing over Betty and approximately three to four inches away from her. She saw Betty trying to raise her head. Betty then said, "Help me. He killed me," twice. Shawn then looked out the back door and saw Cobb standing on the porch. She did not see a knife in his hand. Shawn ran out of the house because she was scared. She saw Cobb get in his car and drive away very quickly. Shawn then ran to Judy Williams' house.

Larry Blum, the pathologist who performed the autopsy on Betty Rogers, was also called to testify. Blum stated that the deceased had suffered four stab wounds: one to the right shoulder; one to the neck approximately three inches below the ear; one to the upper back above the shoulder blade; and one to the back of the neck. The wound to the back of her neck also cut into her esophagus. This caused the deceased to aspirate blood into her lung and asphyxiate. Simply put,

she drowned by swallowing her own blood. Blum testified that the injuries sustained were caused by a sharp object and were most likely inflicted from the rear. The wounds were consistent with the use of a knife. The deceased had no facial or upper body bruises or lacerations. The deceased had not been subjected to blunt trauma immediately prior to her death. He also testified that the deceased's blood-alcohol content was .323%. This would cause a person's reaction time to be slowed. This amount of alcohol could also cause a person to be boisterous or aggressive.

The proofs were closed, and the instructions were given. The trial court gave instructions on the defense of justifiable use of force at the defendant's request. The court refused the defendant's instructions regarding the decedent's violent character or reputation. The jury subsequently returned a guilty verdict of murder.

The cause proceeded to a sentencing hearing on December 11, 1987. The trial court first heard and denied the defense motion for a new trial and an amended motion based on newly discovered evidence. Defendant then requested that a report prepared by Dr. Suraleah Michaels, the clinical psychologist who had interviewed and tested Cobb, be considered at sentencing. Defendant had earlier offered a copy of defendant's post-arrest statement in mitigation. In the statement, defendant described his argument with Betty Rogers on the night of November 3, 1986, when she refused his request for a cigarette. Since he and Betty were having problems, he went and got her clothing from his residence when the football game ended. Later, when he returned from a trip to the bathroom at the Rogers house, he found Betty in an argument with Dorothy. The sisters were fighting, and one had a knife. Defendant tried to break up the fight. Betty cut him on the forehead with a knife or other object. He was bleeding and panicked and acted to defend himself. He was not sure what he did, but he might have cut Betty. Defendant made a statement at sentencing and expressed his regret for what had occurred. He reiterated that he had intervened in a fight between Betty and Dorothy, that Betty had cut his forehead and that he had then been triggered to act. He could have acted to hurt Betty at that time.

At the close of the hearing, the trial court sentenced defendant to a term of 32 years' imprisonment upon his conviction. Defendant then filed a timely notice of appeal.

One theory of defense relied upon in this matter was a theory of self-defense justifying Cobb's actions. The State sought through a motion *in limine* to prevent defendant from introducing any evidence of an incident that occurred 16 years ago in which the victim had

stabbed and killed a man. The defendant sought to introduce this evidence to establish that the victim had a violent character and, therefore, may have been the aggressor. The State argues that the victim was acquitted of the charges relating to the stabbing incident and, therefore, the evidence does not establish that she had a violent character. Additionally, the State points to the fact that this incident occurred 16 years ago and is of little relevance. The court granted the State's motion, and defendant assigns error to that decision.

■■ We find that this issue has not been properly preserved for our review. Generally, to preserve the issue of the wrongful exclusion of evidence for review, an offer of proof must be submitted. (*People v. Christen* (1980), 82 Ill. App. 3d 192, 196.) The purpose of an offer of proof:

> "[I]s to initially indicate to the trial court and opposing counsel, out of the presence of the jury, the substance of the evidence expected to be offered, so that opposing counsel may object to, and the court may rule on, the admissibility of the evidence presented in the offer of proof. [Citations.] If the trial court sustains an objection to the evidence presented in the offer of proof, it then serves to preserve the evidence for a reviewing court's determination of the propriety of the trial court's ruling." (*People v. Duarte* (1979), 79 Ill. App. 3d 110, 123.)

A detailed and specific offer of proof is necessary when it is not clear what the witness' testimony will be or his basis for so testifying. (*People v. Robinson* (1977), 56 Ill. App. 3d 832, 837.) If the evidence sought is obviously relevant and material, an offer of proof is not required. (*Christen*, 82 Ill. App. 3d at 196.) "Thus, where the trial court is sufficiently aware of the purpose for which the evidence is offered and the substance of the testimony to be elicited, an offer of proof need not be tendered." *Christen*, 82 Ill. App. 3d at 196.

■■ In the case at bar, defendant did not make an offer of proof. Defendant's counsel simply stated that he was prepared to call the police officer who investigated the prior incident to testify as to a character trait of violence or turbulence. This is wholly insufficient to preserve this issue for review. "[A]n informal offer of proof [by an attorney] which merely summarizes the witness' testimony in a conclusory manner is insufficient to preserve the error." (*Mulhern v. Talk of the Town, Inc.* (1985), 138 Ill. App. 3d 829, 834.) We have no way of determining exactly what the substance of the testimony was. Additionally, we do not know the basis of the officer's knowledge. The officer may have simply been recalling what other people had told him during his investigation of the incident. This would, of course, be in-

admissible hearsay. We cannot fairly determine from the whole record whether excluding this undefined testimony was reversible error. (*People v. Lynch* (1984), 104 Ill. 2d 194, 202.) Since defendant did not adequately tender an offer of proof, we find this issue to be waived.

Defendant's next contention is that the court erred in refusing to give the jury an instruction relating to the evidence that defendant was able to adduce at trial pertaining to the victim's violent character. We disagree. Defendant's instruction No. 5 stated:

> "Evidence that Betty Jean Rogers was a woman of turbulent or quarrelsome character may be considered by you in determining who was the aggressor in the instant case."

The court correctly refused this instruction, and defendant's instruction No. 5a was then submitted. This instruction stated:

> "The evidence that Betty Jean Rogers was a woman of violent or quarrelsome reputation may be considered by you in determining who was the aggressor in the instant case."

This instruction was also correctly refused.

Defendant points out that Dorothy testified that the deceased had once maced defendant and that she was sometimes a different person when drunk. Also, Judy Williams testified that when the deceased drank, she would become rowdy and argumentative. Defendant argues that the court erred in not instructing the jury on how to use this character and reputation evidence.

■ It is fundamental that a defendant is entitled to an instruction on his theory of the case. (*People v. Lefler* (1967), 38 Ill. 2d 216, 222; *People v. Isbell* (1988), 177 Ill. App. 3d 854, 865.) In a criminal prosecution, very slight evidence on a given theory will justify the giving of an instruction on that theory. *Isbell*, 177 Ill. App. 3d at 865.

■ Initially we note that character and reputation are two separate and distinct matters. Character pertains to what a person actually is, and reputation pertains to what others think that person is. (*People v. Buchanan* (1980), 91 Ill. App. 3d 13, 17.) Character is shown by proof of specific acts, and acts of violence are admissible when the victim's character is being established to support a theory of self-defense. *Buchanan*, 91 Ill. App. 3d at 17.

■ In the case at bar, defendant's theory was self-defense or justifiable use of force. The court provided the jury with a proper instruction pertaining to this theory of defense. Defendant claims that the court should have further instructed the jury as to how the evidence of the victim's character and reputation fit into his theory of the case or how it should have been considered.

We find that the evidence elicited was not probative of the vic-

tim's character or reputation. The only *character* evidence elicited was the testimony of Dorothy alluding to a specific instance in which the victim maced the defendant. This testimony does not establish that the victim had a violent character. There is no evidence in the record as to what the circumstances surrounding this incident were. It is possible that defendant attacked the victim and her response was necessary to protect herself. We simply do not know why the victim maced the defendant, and, therefore, the sparse evidence of the incident does not tend to establish the victim had a violent character.

The only *reputation* evidence that was elicited came from Dorothy Rogers and Judy Williams. They testified that when the victim drank, she became a different person. She became "rowdy and argumentative." We do not find that this evidence tends to establish that the victim had a reputation for violence. (*Cf. People v. Fischer* (1981), 100 Ill. App. 3d 195, 199 (testimony relating incident in which, after drinking, victim became loud, rowdy, pounded on the bar and was less orderly is insufficient to establish that victim was violent in nature and has no probative value in determining whether victim was the aggressor).) We find that the testimony was not probative of a violent character or reputation. By giving defendant's instruction No. 5 or 5a, the court would have been telling the jury that appropriate reputation and character evidence was elicited when in fact it was not. We hold that the evidence adduced at trial was not sufficient to require the trial court to give an instruction on how to use this evidence. Therefore, the trial court's decisions to refuse defendant's instructions Nos. 5 and 5a were proper.

Defendant's next contention is that the trial court erred in admitting a statement made by the victim after she was stabbed and shortly before her death. The court found that the statement constituted a dying declaration and spontaneous utterance. Therefore, it was admissible as an exception to the rule against hearsay.

■ A dying declaration is a statement of fact made by the victim, relating the cause and circumstances of the homicide. (*People v. Tilley* (1950), 406 Ill. 398, 403; *People v. Odum* (1963), 27 Ill. 2d 237, 242.) To establish a dying declaration, it must appear that the statement was "made by the victim under the fixed belief and moral conviction that death is impending and certain to follow almost immediately, without opportunity for repentance and in the absence of all hope of avoidance, when he has despaired of life and looks to death as inevitable and at hand." (*Tilley*, 406 Ill. at 403; *Odum*, 27 Ill. 2d at 242-43.) An additional requirement is that the declarant must be in possession of his/her mental faculties sufficiently to comprehend what he/she is

doing and to have the ability to give a true and accurate account of the circumstances to which this statement relates. (*Tilley*, 406 Ill. at 403; *People v. Rhoads* (1982), 110 Ill. App. 3d 1107, 1119; *People v. Davis* (1981), 93 Ill. App. 3d 217, 231.) Before such statements are admitted, and upon a preliminary hearing outside the presence of the jury, the trial court must be convinced beyond a reasonable doubt that the elements of a dying declaration are present. (*Tilley*, 406 Ill. at 403-04; *Davis*, 93 Ill. App. 3d at 231.) The court takes into account all the facts and circumstances surrounding the declarant before, during and after the statement is made. *Tilley*, 406 Ill. at 403; *People v. Webb* (1984), 125 Ill. App. 3d 924, 934; *People v. Calahan* (1976), 42 Ill. App. 3d 994, 998.

■ The standard for judicial review of the trial court's conduct in admitting a dying declaration is whether the record supports the trial court's factual determination. (*People v. Van Broughton* (1976), 35 Ill. App. 3d 619, 624.) Our supreme court has stated that it is "reluctant to disturb the ruling of the trial judge on the admissibility of a purported dying declaration." (*Odum*, 27 Ill. 2d at 239.) Applying this standard of review to the principles set forth above and the facts of this case, we find that the court did not err in admitting the victim's statement.

Defendant contends that the State did not establish that the declarant was competent when she made the statement. Defendant points to the fact that the victim had a very high blood-alcohol content when she died and, therefore, she could not have accurately perceived or truthfully reported what had occurred. It is our opinion, and we have found no authority to the contrary, that the fact that the victim had a very high blood-alcohol content does not automatically and as a matter of law mean that the victim was not sufficiently in possession of her mental faculties so as to be unable to comprehend what she was doing and did not have the ability to give a true and accurate account of what happened. There is no evidence in the record the victim was so intoxicated as to be incoherent. No one testified that her speech was slurred or that she did not know what she was doing or with whom she was relating.

In *Davis*, the evidence indicated that the declarant had a substantial quantity of morphine and traces of alcohol in his bloodstream when he died. The defendant argued that the State failed to show that the declarant was in sufficient possession of his faculties due to this evidence. The court, reviewing all the surrounding facts and circumstances, found that the declarant had promptly and accurately responded to questions asked of him and, therefore, the declarant was

in sufficient possession of his faculties. (*Davis*, 93 Ill. App. 3d at 232-33.) The reviewing court affirmed the trial court's decision to admit the dying declaration.

Likewise, we find that in spite of the declarant's high blood-alcohol content, a review of all the circumstances surrounding the statement indicates that the record supports the trial court's factual determination. The decedent's blood-alcohol content at the time the statement was made may affect the weight given to the statement but will not render it inadmissible.

Defendant also asserts that the statement was too indefinite because the declarant did not identify her assailant but only stated that "He" killed "me." Defendant cites to our supreme court's opinion in *People v. Scott* (1972), 52 Ill. 2d 432, 438, for the proposition that the testimony recounting the declaration cannot be conjectural, and the declaration must be positive and definite. In *Scott*, the declarant could barely speak and, in essence, mumbled the declaration. The witness was not sure what the declarant had said and could only speculate as to the actual statement. It is in that context that the court required the declaration to be positive and definite.

In this case, there is no evidence that the declaration was not clearly enunciated. In the factual context of the case, defendant was the only "He" in the vicinity of the homicide. The fact that the declarant did not identify the person who stabbed her by specific name bears on the weight of the testimony and not its admissibility. The court correctly admitted the statement as a dying declaration.

Based upon the above finding, it is unnecessary for us to determine if the statement is also admissible as a spontaneous utterance.

Defendant next contends that the trial court committed reversible error by failing to instruct the jury *sua sponte* that, to convict the defendant of murder, the State had to prove beyond a reasonable doubt that defendant did not subjectively believe circumstances existed which justified the use of force. Defendant asserts that in this case, this additional element should have been included in the murder instruction.

Defendant tendered, and the court gave, the following instructions:

Defendant's Instruction No. 4

"To sustain the charge of murder, the State must prove the following propositions:

First: That the defendant performed the acts which caused the death of Betty Jean Rogers; and

Second: That when the defendant did so, he knew that his

acts created a strong probability of death to Betty Jean Rogers.

Third: That the defendant was not justified in using the force which he used.

If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.

If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty."

Defendant's Instruction No. 2

"A person is justified in the use of force when and to the extent that he reasonably believes that such conduct is necessary to defend himself against the imminent use of unlawful force.

However, a person is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another."

Defendant asserts that the defense of justifiable use of force has two components: (1) a subjective belief that the use of force was necessary for self-protection; and (2) the reasonableness of that belief. Defendant argues that the trial court should have instructed the jury in such a way that these two components of justifiable use of force were separated. Consequently, if the State could not prove that defendant did not possess a subjective belief in the necessity of using force, he could not have been convicted of murder. The instructions that were not submitted, but defendant asserts should have been submitted to the jury, would have required the jury to reject both components of the defense beyond a reasonable doubt in order to convict defendant of murder.

■ It has long been established in Illinois that it is the court's duty to give or refuse the instructions tendered by the parties, and a party cannot complain of the court's failure to give an instruction unless the instruction is prepared and tendered. (*People v. Lucas* (1910), 244 Ill. 603, 614; *People v. Harrison* (1946), 395 Ill. 463, 477; *People v. Barnard* (1984), 104 Ill. 2d 218, 232.) The court has no obligation to instruct *sua sponte*. (*People v. Weisberg* (1947), 396 Ill. 412, 421; *People v. Parks* (1976), 65 Ill. 2d 132, 137.) Also, the trial court has no duty to rewrite instructions tendered by counsel. *Barnard*, 104 Ill. 2d at 232.

Defendant cites *People v. Reddick* (1988), 123 Ill. 2d 184, to support his contention that, to sustain a conviction for murder, the State

must prove that the defendant did not have a subjective belief that use of force was necessary. *Reddick*, a consolidated case, involved situations in which the defendants admitted the killings but aggressively pursued voluntary manslaughter defenses. The court stated the issue as follows:

"When a defendant charged with murder asserts that the killing (if unjustified) is at most voluntary manslaughter because \*\*\* he acted in the unreasonable belief that the killing was justified \*\*\*, who bears the burden of proof on [this issue] and what is the extent of the burden?" (*Reddick*, 123 Ill. 2d at 193.)

The court described the pertinent murder and voluntary manslaughter instructions as follows:

"[T]o sustain the murder charge the People must prove beyond a reasonable doubt that the defendant performed the acts which caused the decedent's death; that when the defendant did so, he knew that his acts created a strong probability of death or great bodily harm to the decedent; and that the defendant was not justified in using the force which he used.
\*\*\*

The voluntary manslaughter - belief of justification burden-of-proof instruction used in each case stated that to sustain the charge of voluntary manslaughter the People must prove beyond a reasonable doubt that the defendant performed the acts which caused the decedent's death; that when the defendant did so, he knew that his acts created a strong probability of death or great bodily harm to the decedent; that when the defendant did so he believed that circumstances existed which would have justified killing the decedent; and that the defendant's belief that such circumstances existed was unreasonable."

*Reddick*, 123 Ill. 2d at 193-94.

The court found that when a defendant charged with murder asserts that he acted pursuant to an unreasonable belief of justification, the State need not present evidence of this mental state to obtain a conviction for voluntary manslaughter. (*Reddick*, 123 Ill. 2d at 195.) The reason for this result is that this mental state is of lesser culpability, and defendant relies on its existence to lessen the culpability of his otherwise murderous conduct. *Reddick*, 123 Ill. 2d at 195.

The court in *Reddick* concluded that, "if a defendant in a murder trial presents sufficient evidence to raise issues which would reduce the charge of murder to voluntary manslaughter, then to sustain the murder conviction, the People must prove beyond a reasonable doubt that those defenses are meritless, and must also prove beyond a rea-

sonable doubt the statutory elements of murder." (*Reddick*, 123 Ill. 2d at 197.) Therefore, "the instructions set forth above, *when read together*, erroneously state the burdens of proof on the [issue] of whether the defendants acted under *** unreasonable beliefs that their actions were justified." (Emphasis added.) *Reddick*, 123 Ill. 2d at 194.

*Reddick* is not dispositive of this case as it does not address the issue at bar and is distinguishable in several important respects. The defendants in *Reddick* admitted the killings but pursued voluntary manslaughter defenses to lessen their culpability. Voluntary manslaughter instructions were tendered and given. The court found that *"when read together"* the instructions were misleading. Conversely, in this case, murder was charged and the defendant did not assert a voluntary manslaughter defense. Defendant did not tender and the court did not give voluntary manslaughter instructions. The murder instruction was not given in conjunction with manslaughter instructions and was not misleading. *Reddick* was examined under a set of circumstances not present here.

An additional issue was presented and discussed in one of the consolidated cases of *Reddick* and is particularly helpful here. The defendant in *Reddick* cited as error the trial court's failure to instruct the jury on the burden of disproving that defendant acted in self-defense. The court noted that when a defendant presents sufficient evidence to raise the issue of self-defense, the jury must be instructed that it is the State's burden to prove beyond a reasonable doubt that the use of deadly force was not justified. (*Reddick*, 123 Ill. 2d at 201, citing *People v. Williams* (1974), 57 Ill. 2d 239, 242.) The jury was instructed that the State had the burden of proving every element of the crimes charged. However, lack of justification was not listed as an element of the crime charged. The court held that the failure to instruct the jury on the State's burden with respect to this element constituted grave and reversible error.

In the case at bar, lack of justification was an element specifically listed in the murder instruction. The import of the above discussion is that the supreme court did not separate the "lack of justification" element into the two components that defendant wishes in this case. The court, while discussing the State's burden of proof and the elements of each offense, did not find that it is the State's burden to prove beyond a reasonable doubt that the defendant did not subjectively believe the use of force was necessary. It is our opinion that, if this is an element that the State must prove, the supreme court would have alluded to it in its statement of the proper instruction to

be given in a murder case involving self-defense.

Defendant also cites this court's decision in *People v. Denson* (1985), 139 Ill. App. 3d 914, to support his position. In *Denson*, the defendant was charged with murder. The defendant admitted he shot the victims but testified that at the time of the shooting several gang members were standing behind the victims and suddenly something struck him in the mouth. He feared that he was going to be attacked so he fired his gun. The defendant claimed on appeal that the conviction of murder should be reduced to voluntary manslaughter because the evidence showed that he believed, *albeit* unreasonably, that the killings were justified. The defendant placed into evidence considerable testimony as to his subjective belief that the use of force was necessary. Voluntary manslaughter was presented to the jury and rejected. This court addressed the issue of who bears the burden of proof when the defendant asserts that the offense committed was manslaughter and not murder. This court, citing *People v. Bolden* (1985), 132 Ill. App. 3d 1047, stated that "[w]here the defendant presents some evidence of [his belief that force was necessary], the burden is on the State to prove beyond a reasonable doubt that he did not have such a belief in order to obtain a conviction of murder." (*Denson*, 139 Ill. App. 3d at 924.) The defendant's goal in *Denson* was a conviction of manslaughter and not murder.

We reiterate that voluntary manslaughter was never presented as a theory of defense to murder in this case. Defendant did not tender instructions regarding voluntary manslaughter and is not arguing on appeal that a voluntary manslaughter instruction should have been given. In fact, as trial counsel enunciated in closing arguments and as appellate counsel points out, one theory of defense was that the State could not prove beyond a reasonable doubt that defendant actually committed the acts complained of. A voluntary manslaughter instruction is most often not warranted with this defense. (See *People v. Hughes* (1982), 109 Ill. App. 3d 352, 361 (defendant who chose to defend on the basis of mistaken identity had a right not to have the jury instructed as to manslaughter); *People v. Falkner* (1985), 131 Ill. App. 3d 706, 710 (defendant has a right to keep the jury from receiving an instruction on lesser included offense if the defense is alibi or mistaken identity).) The decision in *Denson* was based on facts not present here and is not dispositive of the issue before us.

In this case, defendant's goal is acquittal on a charge of murder. Defendant's closing argument relied solely on the defense that the State did not prove beyond a reasonable doubt that he committed the acts complained of. Defendant's other theory of defense was *justifi-*

*able* use of force, not *unjustifiable* use of force. Defendant never introduced evidence that he committed the acts but that, while doing so, he had a subjective belief that these acts were necessary to prevent imminent death or great bodily harm. Defendant did not place his subjective belief in issue and chose to rely on the defenses that he was not proved to have stabbed the victim and, if so, that he was justified in his actions. He chose not to submit an instruction on voluntary manslaughter because he did not want to run the risk of being convicted of this offense. However, he believes the court should have submitted a form of the manslaughter instruction to avoid the murder conviction. Defendant is asking for a manslaughter instruction to be infused into a murder instruction. We find no authority or rationale that supports this undertaking.

In this case, where the defendant did not introduce any evidence of his subjective belief, the State does not have to prove the additional element that defendant asserts. We find that the jury received proper instructions on murder and justifiable use of force. Therefore, the court did not err by not *sua sponte* rewriting the instruction submitted.

■■ Defendant next contends that he was denied a fair trial because of several improper comments and misconduct by the State. Every defendant is constitutionally entitled to a fair and impartial trial regardless of his guilt or innocence. (*People v. Brown* (1983), 113 Ill. App. 3d 625, 629.) This includes the right to a trial free from improper comments. (*People v. Roberts* (1981), 100 Ill. App. 3d 469, 477.) However, a conviction will not be disturbed unless these comments constitute a material factor in the conviction or result in substantial prejudice to the defendant. *Roberts*, 100 Ill. App. 3d at 477; *People v. Witted* (1979), 79 Ill. App. 3d 156, 165.

The first instance of alleged misconduct occurred during the State's opening argument. The prosecutor informed the jury that it would hear testimony about a prior threat on the victim's life made by defendant. The State did not proffer this evidence during the trial.

■■ The fact that the State informed the jury that it would present evidence of a prior threat on the victim's life, and then failed to present it, does not necessarily constitute reversible error. It is improper, with foreknowledge, to include matters in an opening statement which are not thereafter proved. (*People v. Platter* (1980), 89 Ill. App. 3d 803, 824.) However, absent deliberate misconduct by the prosecutor, this is not reversible error unless the reference resulted in substantial prejudice to the defendant. (*Platter*, 89 Ill. App. 3d at 824.) We cannot infer from the record that this omission of evidence

was deliberate misconduct on the part of the prosecutor. Additionally, the jury was informed on several occasions by counsel and by the court that opening statements are not to be considered as evidence. We do not find that this comment resulted in substantial prejudice to defendant. Therefore, it was not reversible error.

The second instance of alleged misconduct occurred during the evidentiary phase of the trial. Defendant alleges that leading questions were asked of Dorothy and Ann Rogers, the two main occurrence witnesses for the State. Defendant claims that these leading questions were highly prejudicial in that the prosecutor essentially substituted her own testimony for that of the witnesses.

■■■ A leading question is a question that suggests the answer by putting into the witness' mind the words or thought of the answer. (*People v. Schladweiler* (1925), 315 Ill. 553, 556.) Generally, it is improper to lead witnesses except on cross-examination. (*Farmar v. Crane* (1975), 32 Ill. App. 3d 383, 389.) It is true that the transcript of the testimony of Dorothy and Ann Rogers contains leading questions. However, defendant was prompt with his objections which the court sustained. Additionally, the court, while recognizing that the witnesses were of limited intelligence, admonished the State and instructed the jury to disregard responses to leading questions that were material. We find that most of the leading questions asked did not involve material information and, when they did, the court cured any error by sustaining objections and instructing the jury to disregard the testimony. (See *People v. Gutierrez* (1985), 136 Ill. App. 3d 774, 785; *People v. Outlaw* (1979), 75 Ill. App. 3d 626, 646.) Therefore, defendant was not prejudiced by the use of leading questions in this case.

Another instance of alleged misconduct occurred during the State's closing argument. Defendant, in his closing argument, argued to the jury that he did not flee or attempt to conceal himself from the police. Additionally, he cooperated with the police after he was arrested. The State, in its rebuttal argument, commented that defendant had no choice but to cooperate as he was arrested. Defendant states that he had a constitutional right to remain silent and to obtain counsel once he was arrested. Defendant claims the prosecutor improperly downplayed defendant's cooperation and, in fact, misstated the law by claiming defendant had no choice but to cooperate. Defendant asserts that this constitutes reversible error.

■■■ The comment made by the prosecutor with respect to defendant's cooperation with the police when he was arrested did not constitute reversible error. A prosecutor's misstatement of the law in

closing argument can be grounds for reversal depending upon the circumstances of the case. (*People v. Eckhardt* (1984), 124 Ill. App. 3d 1041, 1043.) However, in this case, the court sustained defendant's objection and clearly instructed the jury to disregard the statement. The court went on to explain to the jury that what is said in closing argument is not evidence and should not be regarded as such. This prompt action by the court cured any error that occurred. Defendant was not unduly prejudiced by the State's comment.

During the discussion of the above issue between the parties and the court, defendant claims another instance of misconduct arose. There was a pretrial order entered which stated that all objections were to be argued outside the presence of the jury. The State had accused defense counsel on several instances throughout the trial of violating that order. During the discussion of the rebuttal argument, and in the presence of the jury, the prosecutor objected to the defense counsel's conduct and stated, "There is a motion *in limine*, a court order, regarding his conduct." Defendant contends that this accusation in the presence of the jury constituted prejudicial error.

This comment should not have been made in the presence of the jury. However, a defendant cannot assert prejudice where he or his counsel has provoked or invited the comments of which he complains. (*People v. Evans* (1988), 173 Ill. App. 3d 186, 205.) It is clear that the State's comment was made in response to defense counsel's violation of the court order. We find that this comment was provoked by defense counsel and, therefore, cannot support a claim of prejudice.

Defendant also asserts that the State's closing argument included inflammatory remarks going beyond the evidence and statements known to be false. It is well established that a prosecutor is given wide latitude in closing argument as long as the comments are based on the evidence or reasonable inferences therefrom. (*People v. Clay* (1984), 124 Ill. App. 3d 140, 149.) The statements objected to by defendant were based on direct testimony of the witnesses and reasonable inferences therefrom. Additionally, as stated previously, the jury was repeatedly instructed that comments made during closing arguments are not evidence. We find no error resulting from these comments of the prosecutor.

Defendant claims that any one of these errors constitutes reversible error, but they also should be considered cumulatively to lead to the conclusion that defendant did not receive a fair trial. The State argues that any error that may have occurred was cured by the court in sustaining defendant's objections and instructing the jury. A reviewing court may consider the cumulative impact of improper prose-

cutorial remarks and conduct rather than assessing them in isolation. (*Brown*, 113 Ill. App. 3d at 630.) The errors that occurred were promptly cured by the court's action. We do not find that the cumulative effect of these errors denied defendant a fair trial.

Defendant next contends that he was denied the effective assistance of counsel because his attorney failed to investigate and present a theory of defense predicated on insanity. We are not persuaded.

■■ "Effective assistance of counsel refers to competent, not perfect, presentation." (*People v. Hillenbrand* (1988), 121 Ill. 2d 537, 548.) To establish ineffective assistance of counsel, a defendant must prove that counsel's performance was deficient and that the defendant was prejudiced by this deficiency. (*People v. Barnard* (1984), 104 Ill. 2d 218, 237, citing *Strickland v. Washington* (1984), 466 U.S. 668, 694, 80 L. Ed. 2d 674, 698, 104 S. Ct. 2052, 2068.) To be deficient, counsel's errors must be so great that counsel is not acting as " 'counsel' [as] guaranteed *** by the Sixth Amendment." (*Strickland*, 466 U. S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.) Errors in trial strategy, judgment or tactics will not, in and of themselves, render counsel deficient. (*Hillenbrand*, 121 Ill. 2d at 548.) To establish prejudice, the defendant must prove that there is a reasonable probability that, but for counsel's deficient conduct, the outcome of the proceeding would have been different. (*Barnard*, 104 Ill. 2d at 237-38.) We must review the record as a whole and the totality of counsel's conduct in determining whether counsel was incompetent. (*People v. Peterson* (1989), 182 Ill. App. 3d 756, 761; *People v. Murphy* (1987), 160 Ill. App. 3d 781, 786.) There is a strong presumption that counsel's conduct falls within the wide range of competent professional assistance. *Peterson*, 182 Ill. App. 3d at 761.

■■ In this case, defendant claims that his attorney did not adequately investigate the possibility of an insanity defense. The only evidence of record that establishes this is the fact that there was no request for a fitness hearing prior to trial and insanity was not offered as a defense at trial. This evidence does not establish that defendant's counsel did not investigate the possibility of presenting an insanity defense.

The choice of presenting the defense of self-defense and not presenting an insanity defense is one of strategy. Additionally, it is clear from the record that defendant's counsel pursued this case vigorously. Counsel made several pretrial motions, cross-examined witnesses extensively, made intelligent arguments to the court based on the evidence presented, submitted post-trial motions and provided evidence and argument at the sentencing hearing. The record does not reflect

that counsel did not consider an insanity defense, and the decision not to present this defense is one of strategy. Defendant received effective assistance of counsel throughout the proceedings and, therefore, is not entitled to a new trial.

Defendant's final contention is that the sentence imposed by the trial court was excessive. Defendant points to the several mitigating factors presented to establish that the imposition of a 32-year prison term was error. We disagree.

■■■ The imposition of a criminal sentence is a matter of judicial discretion, and the decision of the trial court will not be altered upon review absent an abuse of discretion. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 153; *People v. Katsigiannis* (1988), 171 Ill. App. 3d 1090, 1102.) A trial court's decision in sentencing is entitled to great weight and deference (*People v. Younger* (1986), 112 Ill. 2d 422, 427-28), and a reviewing court will not substitute its judgment for that of the trial court simply because it would have balanced the appropriate factors differently. (*People v. Cox* (1980), 82 Ill. 2d 268, 280.) This is especially true where the sentence imposed is within the statutory limitations. *People v. Lambrechts* (1977), 69 Ill. 2d 544, 559.

The trial court conscientiously took into account all factors in aggravation and mitigation. The court considered the psychiatric evaluations presented and defendant's statement in mitigation, but placed great weight on the fact that the victim was stabbed four times, three times in the back. The court took into account the appropriate factors and made a reasoned decision.

We find that the court did not abuse its discretion in sentencing defendant to a term of 32 years.

For the reasons stated, the judgment of the circuit court of Lake County is affirmed.

Affirmed.

LINDBERG and REINHARD, JJ., concur.