NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 190333-U

NO. 4-19-0333

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 15, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|     Plaintiff-Appellee, | ) | Circuit Court of |
|     v. | ) | Moultrie County |
| MICHAEL S. YOST, | ) | No. 15CF6 |
|     Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Wm. Hugh Finson, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Justices Cavanagh and Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The appellate court reversed defendant's conviction and remanded the case for a
new trial where trial counsel labored under a *per se* conflict of interest and
defendant did not waive his right to conflict-free representation.

¶ 2    Following a September 2016 bench trial, the trial court found defendant, Michael

S. Yost, guilty of first degree murder (720 ILCS 5/9-1(a)(1) (West 2014)) and sentenced him to

75 years in prison. On appeal, this court allowed the State's motion for agreed summary remand

pursuant to *People v. Krankel*, 102 Ill. 2d 181, 464 N.E.2d 1045 (1984). On remand, the trial

court appointed independent counsel to investigate defendant's claim of ineffective assistance of

trial counsel. In April 2019, defendant's new counsel filed a motion for a new trial, arguing trial

counsel had a *per se* conflict of interest due to his prior representation of the victim in this case.

Following a May 2019 hearing, the trial court denied the motion.

¶ 3        Defendant appeals, arguing the trial court erred in denying his motion for new trial because his trial counsel labored under a *per se* conflict of interest and defendant did not waive his right to conflict-free representation. For the following reasons, we agree, reverse defendant's conviction, and remand for a new trial.

¶ 4                                I. BACKGROUND

¶ 5        In March 2015, the State charged defendant by information with four counts of first degree murder (720 ILCS 5/9-1(a)(1) (West 2014)). Count IV alleged that defendant, without lawful justification and with the intent to kill Sheri Randall, stabbed Randall multiple times, thereby causing her death, and the murder was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty. In June 2016, defendant waived his right to a jury trial and elected to proceed to a bench trial.

¶ 6                                A. Bench Trial

¶ 7        Defendant's bench trial proceeded over four days beginning on September 12, 2016. We discuss only the evidence relevant to the disposition of this case.

¶ 8                          1. *The State's Case-in-Chief*

¶ 9        Andrew Pistorious testified he was a police officer for the city of Sullivan, Illinois, and had been employed there for 13 years. Pistorious testified that he was on duty on March 4, 2015, and responded to a call at 1003 North Graham Street, Apartment 1, in Sullivan. When he entered the apartment, he could see "large amounts of blood in the kitchen area." When he entered the bedroom, he saw "two victims laying on the floor with large amounts of blood on the bed and floor."

¶ 10       As paramedics assessed the two individuals, Pistorious took photographs of the scene. The State introduced a photograph, which was marked as People's Exhibit No. 1.

Pistorious testified the photograph showed three subjects: a male, who he identified as defendant, a female, who he identified as Sheri Randall, and another male, Chief Mike Piper. Pistorious testified that the photograph showed Sheri "with a gaping gash on her side, with puncture wounds, and the male subject *** on his right side with his left arm on top of Sheri Randall." He again identified the male subject as defendant.

¶ 11 Pistorious testified that because defendant was still breathing, he was taken by ambulance to an emergency room for treatment. The State introduced various other photographs taken by Pistorious, which were marked as Exhibit Nos. 2 to 13, and which depicted defendant during his emergency room visit. The photographs showed defendant's injuries, including wounds on his feet, puncture wounds on his side, a large bruise on his hip, and a laceration on his arm near his elbow.

¶ 12 Sheryl Cochran testified she previously had a dating relationship with defendant. She was aware that defendant and Sheri also had a dating relationship. Cochran testified that around the time of Sheri's death, Cochran and defendant spoke on the phone. During this conversation, defendant told her "he was very emotional—and [defendant and Sheri] were broken up at the time—and he—I will quote this, he said, 'If I cannot have Sheri, then nobody else can.' "

¶ 13 Tamara McRill-Chambers testified she and defendant previously had a dating relationship and that they remained on friendly terms after the relationship ended in 2014. McRill-Chambers testified that during a phone conversation in January 2015, defendant stated that his relationship with Sheri "wasn't going to end well and he fanaticized [*sic*] about killing her and killing himself." McRill-Chambers also testified that in January 2015 she had a conversation with defendant using an application called Facebook Messenger. A transcript of the

conversation was introduced as People's Exhibit No. 19 and later admitted into evidence over defendant's objection. In the conversation, defendant told McRill, "You need to get your stuff soon," because "this place will be a crime scene soon." When McRill asked "Why?" defendant responded, "Don't worry about—just get your stuff soon. I do want you to have it. Let's just say, I got Dexter plans." McRill explained that when referring to "Dexter," defendant was alluding to a "serial killer show" and that Dexter committed murders where he "would plastic off a room to keep the blood splatter from getting on everything and then show his victims pictures of the people they've wronged and then kill them."

¶ 14          John Meyers, Jeffrey Lewis, and Stephanie Shaw all testified that they were present at a bar called the Night Landing on the evening of February 27, 2015, where they observed defendant. Each witness testified that they observed an interaction between defendant and Sheri wherein defendant threatened to kill Sheri. Meyers testified the threat occurred as defendant was leaving the bar. Lewis testified he heard defendant say to Sheri, " 'I will kill you, you b***h—you f**king b***h.' " Shaw testified that defendant said to Sheri, " 'I ought to kill you, b***h.' "

¶ 15          Jamie Lynn Polk and Heather Click both testified they were employed at a bar called the Landing and observed defendant and Sheri drinking there on the evening of March 3, 2015. Each witness testified they observed defendant purchase drinks for Sheri, but that defendant did not interact with Sheri directly except for when Sheri went outside to smoke. Click testified that around 10:30 p.m., she escorted defendant out of the bar because "he was yelling and causing a raucous [*sic*] because Sheri was down at the end of the bar having fun and one of the guys and her kind of bumped into one another and [defendant] flipped out and started yelling at him."

¶ 16 Hilary Grimm testified she saw defendant on March 4, 2015, walking down North Seymour Street in Sullivan around 5:50 a.m. as she was leaving for work. Defendant was walking away from his trailer on North Seymour Street in the direction of North Graham Street. Grimm testified she believed defendant was wearing a hooded sweatshirt.

¶ 17 Jill Bassett testified that she commonly goes by Nicki and that she had been friends with Sheri for 30 years. Bassett described Sheri and defendant's relationship as "off again/on again" and that they were not dating on March 4, 2015. Bassett testified she lived next door to Sheri and they shared a laundry room that was between the two apartments. Because they were "good friends" and "trusted each other," Bassett and Sheri usually did not lock their apartment doors leading to the laundry room and there was "movement back and forth between the two apartments." Bassett testified that on March 4, 2015, she took a lunch break at her apartment around 11 a.m. She went through the laundry room and attempted to enter Sheri's apartment, but the door was locked. Bassett stated that she knocked on the door but did not receive a response. She "knew something was wrong," so she picked the lock with a clothes hanger and entered Sheri's apartment. When Bassett entered the apartment, there was "blood everywhere" with "a trail from the living room, from the kitchen into [the] living room into the bedroom," where she found Sheri and defendant lying on the floor. Bassett testified there was a blanket over Sheri and defendant was lying right next to Sheri with his hand over her.

¶ 18 Stephen Hulen testified he was a crime scene investigator with the Illinois State Police. Hulen testified he was called to 1003 North Graham Street, Apartment 1, in Sullivan around 2 p.m. on March 4, 2015. When Hulen arrived, he observed a broken window on the west side of the apartment. Hulen testified the window "appeared to be broken from the outside in." Hulen observed footprints in the snow on the ground near the window and "directly under the

window there was broken glass and a concrete block." Hulen testified that when he entered the bathroom, he noticed "several drops of a blood-like substance on the floor, on the vanity, on the sink." Additionally, Hulen observed "a blood-like substance" on "a Clorox bottle on the tank of the toilet." Hulen also observed a footprint on the kitchen floor. Hulen testified the kitchen footprint appeared to be "a barefoot or sock foot." Hulen observed several weapons near Sheri's body, including two "steak or kitchen knives" on the left side of her body, "one knife" on her right, and a box cutter on the bed. Hulen testified some of the wounds on her hands could have been defensive wounds. Hulen testified he collected the following items for potential forensic testing: a pair of black tennis shoes from the bed, the Clorox bottle from the bathroom, a cell phone that was found under the broken window in the southwest bedroom, a gray sock, the box cutter, the kitchen knives, and swabs from the door to the laundry room, the bathroom sink, and the kitchen sink.

¶ 19          Corey Formea testified he worked for the Illinois State Police Forensic Lab in Springfield and that he specialized in deoxyribonucleic acid (DNA) analysis. Formea testified that he was able to conclude, with a reasonable degree of medical or forensic scientific certainty, that the following items contained a DNA profile consistent with that of defendant or from which defendant could not be excluded: (1) the swab from the kitchen sink, (2) the Clorox bottle from the bathroom, (3) the swab from the door handle to the laundry room, (4) the box cutter, (5) the black tennis shoes, (6) the swab from the bloody footprint on the kitchen floor, and (7) the gray sock.

¶ 20          Dr. Shiaping Boa testified he was a forensic pathologist and performed an autopsy on Sheri Randall on March 5, 2015, in Urbana, Illinois. In his expert opinion, the cause of Sheri's death was multiple stab wounds "due to assault by another person or persons." Sheri

could not have inflicted the wounds herself because "she had stab wounds on the back, which she cannot reach" and had a "classic defensive wound on the hands." Dr. Boa testified it took "probably one hour for her to die" and it "was not a quick death because no critical vessels [were] cut." Dr. Boa also testified that he reviewed defendant's medical records from when he was admitted on March 4, 2015. In Dr. Boa's opinion, defendant's injuries were self-inflicted because they were in the "same direction, same pattern," in contrast to Sheri's, which were "different, the direction, and clearly indicated the body moved—the body movement and body struggle."

¶ 21                              2. *Defendant's Case-in-Chief*

¶ 22        Defendant testified he was diagnosed with Type 2 diabetes in 2013. On March 3, 2015, defendant left his trailer and walked to the Landing around 11:30 a.m. Over the course of the afternoon, defendant had about four beers. He left between 2 p.m. and 3 p.m. and returned to his trailer. He stopped there only briefly before walking back to the Landing. At this point, he had not had anything to eat but had taken approximately 75 units of Lantus, his insulin medication, around 7:30 a.m. Defendant did not remember leaving the Landing and did not remember much from the time period between 3:30 p.m. to 9:30 p.m. Defendant did not recall being escorted out of the bar. The next thing defendant remembered was being at Sheri's apartment and talking with her while she cooked. After that, defendant did not recall what occurred but remembered regaining consciousness in Sheri's bedroom, where he was between the bed and dresser. Defendant remembered waking up and pulling a knife out from his left upper abdomen area before collapsing again.

¶ 23        Dr. Gregory Clark was admitted as an expert in endocrinology. In his professional opinion, after reviewing defendant's medical records, Dr. Clark believed defendant's diabetes

was "not well controlled." Dr. Clark testified that on March 3, 2015, defendant was severely hypoglycemic, meaning his blood glucose levels were well below the normal range. Dr. Clark testified that, within a reasonable degree of scientific certainty, defendant likely lost consciousness on the evening of March 3, 2015, because of a diabetic episode.

¶ 24　　　Following closing arguments, the trial court found defendant guilty on all four counts of first degree murder.

¶ 25　　　　　　B. Posttrial Proceedings and First Direct Appeal

¶ 26　　　On September 21, 2016, defendant wrote a letter to the trial court requesting a new trial. In the letter, defendant alleged the following:

> "I have just been made aware that my Attorney Mr. Brad Rau was also a[n] attorney for the victim in my case Mrs. Sheri Randall in a past case of hers. This means they had a past working relationship together which means there was a conflict of interest. Nobody made me aware of this when Mr. Rau was appointed to me and I never once said I was okay with this. With a case a[s] serious as mine this is something that should never be overlooked. I feel this was very unfair to me and that is why I now motion the court for a new trial ***."

According to a docket entry dated September 22, 2016, the trial court placed defendant's letter on file and directed the circuit clerk to forward copies of the letter to the State and defense counsel. On September 30, 2016, defendant's trial counsel filed a motion for a new trial, which the trial court denied.

¶ 27　　　On October 21, 2016, the trial court found the four counts merged and sentenced defendant to 75 years in prison on count IV. Defendant timely filed a motion to reconsider the sentence, which the trial court denied.

¶ 28 Defendant appealed, and pursuant to *Krankel*, 102 Ill. 2d at 189, this court allowed the State's motion for agreed summary remand for a preliminary inquiry into the factual basis of defendant's claim of ineffective assistance of trial counsel based on an alleged conflict of interest. *People v. Yost*, No. 4-16-0903 (2019) (unpublished summary order under Illinois Supreme Court Rule 23(c)).

¶ 29                                    C. *Krankel* Proceedings

¶ 30 On March 7, 2019, the trial court conducted a preliminary *Krankel* inquiry. At the hearing, defendant informed the court that his trial counsel previously represented the victim in this case. At the conclusion of the hearing, the court found that defendant's claim had merit and appointed new counsel to investigate defendant's claim of ineffective assistance of trial counsel. On April 2, 2019, defendant's new counsel filed an amended motion for new trial, alleging trial counsel labored under a *per se* conflict of interest and defendant never waived his right to conflict-free representation.

¶ 31 On May 21, 2019, the trial court held a hearing on defendant's amended motion for new trial.

¶ 32                                    1. *Defendant's Testimony*

¶ 33 Defendant testified that he was currently incarcerated at Lawrence Correctional Center and was convicted of first degree murder on September 15, 2016. Prior to that date, defendant did not know that his trial counsel, Bradford Rau, previously represented the victim in his case, Sheri Randall. Defendant's mother discovered this information through an internet search on a website called Judici. She told defendant about her discovery sometime after his conviction but before the sentencing hearing in October 2016. Defendant stated he never waived this conflict and "was never made aware of it at all."

¶ 34    On cross-examination, defendant testified that after he discovered Rau previously represented Sheri, he informed his trial counsel of that fact. Rau then told defendant that "it didn't matter." Specifically, Rau told defendant he "was unsure whether he had represented [the victim] or not, but if he had, it didn't matter because she had passed away ***." Rau did not tell defendant that Sheri's case involved a charge for driving under the influence (DUI), but defendant knew this was the case because "it showed up in Judici records." When asked if Sheri's DUI was seven years prior to his conviction, defendant testified that he did not remember.

¶ 35    At the conclusion of defendant's testimony, the court took judicial notice of its own records in *People v. Randall* (Moultrie County case No. 08-DT-22) and in the present case. The court also admitted People's Exhibit No. 1 into evidence, which contained a notarized affidavit from defendant's trial counsel.

¶ 36              2. *Bradford Rau's Testimony*

¶ 37    Rau testified that he served as a public defender in Moultrie county from 2004 to 2017. Rau further testified that he represented defendant through the bench trial in this case. He agreed that according to the circuit court's records, he also represented Sheri Randall, but he had no independent recollection of the representation. At the beginning of his representation of defendant and through the bench trial, Rau had no independent recollection of representing Sheri. After defendant brought up Rau's representation of Sheri after trial, Rau still did not recall representing her. Consequently, Rau agreed that in his representation of defendant, he did not feel that he "owed any duties or obligations" to Sheri.

¶ 38    On cross-examination, Rau testified that despite not recalling his representation of Sheri, he had no reason to doubt the circuit court's records. Rau believed that he spoke with

defendant about the issue at some point and remembered that defendant had sent a letter to the trial judge, Judge Flannell. Rau also recalled that the court addressed defendant's letter at some point but admitted he could not find anything in the record to support that recollection.

¶ 39                                     3. *Trial Court's Decision*

¶ 40          At the conclusion of the hearing, the trial court denied defendant's motion for new trial, stating:

> "Mr. Rau didn't recall representing [Sheri], and he still doesn't recall it based upon his testimony today. Admittedly he did not disclose to [defendant] that he previously represented [Sheri], but then he didn't remember the representation. [Defendant] found out from his mother researching online. She told him and then he told Mr. Rau. There was no knowing waiver—waiver, knowing or otherwise, of the issue by [defendant]. The important thing the Court sees is that Mr. Rau's representation of *** [Sheri] ended seven years before this case was filed, and when that negotiated plea was presented, from that point on he no longer had any duty or obligation to her. The evidence indicates that the DUI case from 2008 is the only thing Mr. Rau ever represented her on, didn't have any kind of ongoing professional relationship with her or with members of her family. He didn't represent her on anything else. Mr. Rau had no financial interest in retaining [Sheri's] favor. He wasn't financially beholden to her because she didn't pay him in the DUI case. She didn't pay a retainer; she didn't have to. He was appointed as public defender and was paid by Moultrie County. The court feels that the *Hillenbrand* decision, which is a decision of the [Illinois] Supreme Court and outweighs the decisions of the appellate courts, applies squarely to this case, that

based on the facts we have in this case and the decision in the *Hillenbrand* case, the Court finds that Mr. Rau had no *per se* conflict of interest."

¶ 41    Thereafter, the trial court entered a written order finding that trial counsel's previous representation of Sheri in Moultrie County case No. 08-DT-22 did not constitute a *per se* conflict of interest in his representation of defendant in the present case and thus denied defendant's amended motion for new trial.

¶ 42    This appeal followed.

¶ 43                                    II. ANALYSIS

¶ 44    Defendant argues the trial court erred in denying his motion for new trial because his trial counsel labored under a *per se* conflict of interest where he previously represented the victim in this case for a 2008 DUI charge and defendant did not waive his right to conflict-free representation. We agree.

¶ 45                                    A. Applicable Law

¶ 46    "The right to effective assistance of counsel under the sixth amendment to the Constitution of the United States entitles a criminal defendant to the undivided loyalty of counsel, free from conflicting interests or inconsistent obligations." *People v. Enoch*, 146 Ill. 2d 44, 51-52, 585 N.E.2d 115, 119 (1991). "A criminal defendant's sixth amendment right to the effective assistance of counsel includes the right to conflict-free representation." *People v. Peterson*, 2017 IL 120331, ¶ 102, 106 N.E.3d 944, *modified on denial of reh'g* (Jan. 19, 2018). "Two categories of conflict of interest exist: *per se* and actual." *Peterson*, 2017 IL 120331, ¶ 102.

¶ 47    A *per se* conflict of interest may be found "(1) where defense counsel has a prior or contemporaneous association with the victim, the prosecution, or an entity assisting the

prosecution; (2) where defense counsel contemporaneously represents a prosecution witness; and (3) where defense counsel was a former prosecutor who had been personally involved with the prosecution of defendant." *People v. Fields*, 2012 IL 112438, ¶ 18, 980 N.E.2d 35. "Under this rule, the defendant's conviction must be reversed if (1) defense counsel has an actual or potential conflict of interest stemming from a previous or current commitment to a party with interests adverse to the defendant, and (2) the defendant does not waive the conflict." *People v. Graham*, 206 Ill. 2d 465, 472, 795 N.E.2d 231, 236 (2003). Moreover, "[i]f a *per se* conflict exists, defendant is not required to show that counsel's actual performance was in any way affected by the existence of the conflict. [Citations.] In other words, a defendant is not required to show actual prejudice when a *per se* conflict exists. [Citation.]" (Internal quotation marks omitted.) *People v. Hernandez*, 231 Ill. 2d 134, 143, 896 N.E.2d 297, 303 (2008). When deciding whether a *per se* conflict exists, the reviewing court should make a "realistic appraisal of defense counsel's professional relationship to someone other than the defendant under the circumstances of each case." (Internal quotation marks omitted.) *People v. Austin M.*, 2012 IL 111194, ¶ 83, 975 N.E.2d 22.

¶ 48        The Illinois Supreme Court has held that generally, defense counsel's representation of the victim need not be "contemporaneous or active" for a *per se* conflict of interest to exist. (Internal quotation marks omitted.) *Hernandez*, 231 Ill. 2d at 151. "Ordinarily, conflict arises from counsel's 'association,' 'relationship,' 'commitment,' 'professional connection,' or 'some tie' with the victim, *** which is either 'prior or current' or 'previous or current.' " *Hernandez*, 231 Ill. 2d at 151.

> "[T]o ensure that a defendant's right to effective assistance of counsel is given
>
> effect, the *per se* conflict rule applies whenever an attorney represents a defendant

and the alleged victim of the defendant's crime, regardless of whether the attorney's relationship with the alleged victim is active or not, and without inquiring into the specific facts concerning the nature and extent of counsel's representation of the victim." *Hernandez*, 231 Ill. 2d at 151-52.

¶ 49 Where the facts are undisputed, the question of whether a *per se* conflict of interest exists is a legal question that this court reviews *de novo*. *Hernandez*, 231 Ill. 2d at 144.

¶ 50 B. This Case

¶ 51 Here, the trial court erred when it determined that trial counsel did not labor under a *per se* conflict of interest. The record affirmatively demonstrates—and the parties do not dispute—that (1) trial counsel represented the victim in this case for a 2008 DUI charge, (2) trial counsel did not disclose his prior representation of the victim to defendant, and (3) defendant did not knowingly waive his right to conflict-free representation. As we discuss below, we find that trial counsel labored under a *per se* conflict of interest as a matter of law. *Hernandez*, 231 Ill. 2d at 143-44.

¶ 52 1. *Hillenbrand*

¶ 53 The trial court found, and the State argues in its brief, that this case is controlled by *People v. Hillenbrand*, 121 Ill. 2d 537, 521 N.E.2d 900 (1988). Defendant argues that (1) *Hillenbrand* only addressed defense counsel's contemporaneous, not prior, representation of a victim and (2) the State improperly relies on *obiter dicta*. We agree with defendant.

¶ 54 The State argues that the *Hillenbrand* case stands for the principle that a *per se* conflict will not be found where "[defense] counsel's prior representation of the victim was in a matter entirely unrelated to the defendant's case" and where the representation concluded long before the case *sub judice*. In *Hillenbrand*, the supreme court found no *per se* conflict of interest

where defense counsel had previously represented the murder victim in preparing income tax returns for a business that she and the defendant owned together. *Hillenbrand*, 121 Ill. 2d at 546-47. In reaching that decision, the supreme court stated that defense counsel's representation of the victim "was concluded long before [the present case]." *Hillenbrand*, 121 Ill. 2d at 545. We agree with defendant that this comment should be viewed as *obiter dicta*. See *People v. Williams*, 204 Ill. 2d 191, 206-07, 788 N.E.2d 1126, 1136 (2003) ("*Obiter dicta* are comments in a judicial opinion that are unnecessary to the disposition of the case" and are "binding *in the absence of* a contrary decision of that court." (Emphasis added.)). The court's comment is inconsistent with its more recent precedent applying the *per se* conflict rule "whenever an attorney represents a defendant and the alleged victim of the defendant's crime, *regardless of whether the attorney's relationship with the alleged victim is active or not, and without inquiring into the specific facts concerning the nature and extent of counsel's representation of the victim*." (Emphasis added.) *Hernandez*, 231 Ill. 2d at 151-52.

¶ 55        The supreme court also cited several cases for the proposition that in order to demonstrate a *per se* conflict of interest, "[t]he defendant *** must show the attorney has a contemporaneous conflicting professional commitment to another." *Hillenbrand*, 121 Ill. 2d at 544-45 (citing *People v. Free*, 121 Ill. 2d 154, 168-69, 492 N.E.2d 1269, 1275 (1986), *People v. Washington*, 101 Ill. 2d 104, 114, 461 N.E.2d 393, 398 (1984), and *People v. Coslet*, 67 Ill. 2d 127, 133-34, 364 N.E.2d 67, 70 (1977)). But the supreme court has also consistently held that a *per se* conflict arises where "certain facts about a defense attorney's status *** engender, *by themselves*, a disabling conflict." (Emphasis in original.) *People v. Spreitzer*, 123 Ill. 2d 1, 14, 525 N.E.2d 30, 34 (1988). Specifically, the supreme court has found "disabling conflicts" in cases involving "the defense attorney's *prior or contemporaneous* association with either the

- 15 -

prosecution or the victim." (Emphasis added.) *Spreitzer*, 123 Ill. 2d at 14-15 (collecting cases); see *People v. Lawson*, 163 Ill. 2d 187, 211, 644 N.E.2d 1172, 1183 (1994) ("The common element in these cases that the defense counsel was *previously or contemporaneously* associated *** with the victim ***." (Emphasis added.)); see also *Graham*, 206 Ill. 2d at 472. Accordingly, we find the State's reliance on *Hillenbrand* unpersuasive.

¶ 56                                    2. *Hernandez*

¶ 57        The State further argues that this case is distinguishable from *Hernandez* because that case involved a contemporaneous, if not "active," representation of both a defendant and a victim. *Hernandez*, 231 Ill. 2d at 138-39. We find this argument unpersuasive. As stated above, the *Hernandez* court clearly stated that a *per se* conflict arises whether the representation is " 'prior or current' or 'previous or current.' " *Hernandez*, 231 Ill. 2d at 151. Moreover, the appellate court has found that "[t]he remoteness of the attorney-client relationship between defense counsel and the murder victim does not preclude a finding of a *per se* conflict." *People v. Cleveland*, 2012 IL App (1st) 101631, ¶ 45, 981 N.E.2d 470. "Nor does defense counsel's representation of the victim in limited proceedings many years ago necessarily preclude a finding of a *per se* conflict." *Cleveland*, 2012 IL App (1st) 101631, ¶ 46. Because the parties do not dispute the facts involved in this appeal and it is not our role to examine the "nature and extent" of the prior attorney-client relationship between the alleged victim and counsel for the defendant, we find the State's argument must fail. Defendant did not waive defense counsel's *per se* conflict of interest and automatic reversal is required. See *Hernandez*, 231 Ill. 2d at 143.

¶ 58        We are mindful of the many issues reversal of defendant's conviction creates. It is obvious from the record this was a case involving substantial media exposure and was aggressively litigated by both sides. Unfortunately, our analysis of our supreme court's reasoning

in *Hernandez* leaves us no alternative. Such is the nature of a *per se* conflict. One purpose for such a rule is to avoid conflicting interests "subliminally affect[ing] counsel's performance in ways difficult to detect or demonstrate"; another is to prevent counsel from "later charges that his representation was not completely faithful." *Hernandez*, 231 Ill. 2d at 143 (citing *Spreitzer*, 123 Ill. 2d at 16-17). Without an adequate record showing defendant's awareness of the conflict and his knowing waiver, we are left with no other option. See *Hernandez*, 231 Ill. 2d at 143. Unless and until our supreme court addresses the tension between *Hernandez* and *Hillenbrand* we are bound by the reasoning set forth above.

¶ 59    It is worth noting this matter could and should have been addressed at the time it was first raised. Defendant testified once he learned of the conflict from his mother, sometime between the finding of guilty and his sentencing hearing, he brought it to the court's and counsel's attention. The defendant was found guilty on September 15, 2016. His letter to the court was filed September 22, 2016, and an accompanying docket entry indicates the clerk was directed to provide a copy of the letter to both the State and defendant's trial counsel. The defendant was sentenced on October 21, 2016, and the issue was not raised at that time. It was not raised in the motion for new trial filed on September 30 or the motion to reconsider sentence filed October 28. Defendant's claim was not addressed on the record until after remand although there were at least the three opportunities listed above. There is no way for us to know, at this juncture, what the result might have been.

¶ 60                          C. Sufficiency of the Evidence

¶ 61    We next turn to whether the evidence was sufficient to remand for a new trial. See *People v. Lopez*, 229 Ill. 2d 322, 367, 892 N.E.2d 1047, 1073 (2008) (holding that a retrial raises double jeopardy concerns requiring us to consider the sufficiency of the evidence). "The relevant

- 17 -

question is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Lopez*, 229 Ill. 2d at 367.

¶ 62        Viewing the evidence in the light most favorable to the State, we conclude that a rational trier of fact could have found defendant guilty of first-degree murder beyond a reasonable doubt based on (1) defendant's prior threats toward Sheri, (2) defendant's presence at the crime scene, (3) Sheri's defensive wounds, (4) expert testimony that defendant's wounds were self-inflicted, and (5) the DNA evidence found in the apartment. Accordingly, we conclude that there is no double jeopardy impediment to retrial and thus remand the cause to the trial court.

¶ 63                              III. CONCLUSION

¶ 64        For the reasons stated, we reverse defendant's conviction and remand the case for a new trial.

¶ 65        Reversed and remanded.